796 F.2d 1009
 40 Fair Empl.Prac.Cas. 883,
39 Empl. Prac. Dec. P 36,011,
42 Empl. Prac. Dec. P 36,799,
104 Lab.Cas. P 34,784
 Cedell BRIGGS and Linda Nimmer on behalf of themselves,
individually and on behalf of females and black persons
similarly situated as classes; John Lewellen, Thomas
Broughten and Homer Winstead, on behalf of themselves
individually and on behalf of black persons similarly
situated as a class; DeLaney Fleming, Ezekiel Kinchen,
Melvin Clayton, Rose Phillips, Janie Allen, Bonnie Brown,
Brenda Jackson and Rose White, Appellants,
v.
Brady ANDERSON, individually and as surrogate or Acting
Director of the Department of Human Services; Elmer
Zielsman, individually and as Acting Director of the Office
of Aging; Dr. Robert Rankin, individually and as
Commissioner of Mental Health Services; Dick Powell,
individually and as Commissioner of Youth Services;
Henrietta Jenkins, individually and as Commissioner of
Mental Health Developmental Disabilities Services; E.
Russell Baxter, individually and as Commissioner of
Rehabilitation Services; Barrett Toans, individually and as
Commissioner of Social Services; and Frankie Wallingsford,
individually and as Director of the Office of Alcohol and
Drug Abuse Prevention, Appellees.
Janie ALLEN, Bonnie Brown, Rose Phillips and Charles H.
Dale, Appellants,
v.
STATE OF ARKANSAS, DEPARTMENT OF HUMAN SERVICES-DIVISION OF
YOUTH SERVICES a/k/a Department of Social Services Division
of Juvenile Services, Dick Powell, Bill Beabers, Betty
McGetrick and June Wilcoxson, Appellees.
Brenda JACKSON and Rose White, Appellants,
v.
Brady ANDERSON, individually and as surrogate or Acting
Director of the Department of Human Services; Elmer
Zielsman, individually and as Acting Director of the Office
of Aging; Dr. Robert Rankin, individually and as
Commissioner of Mental Health Services; Dick Powell,
individually and as Commissioner of Youth Services;
Henrietta Jenkins, individually and as Commissioner of
Mental Health Developmental Disabilities Services; E.
Russell Baxter, individually and as Commissioner of
Rehabilitation Services; Barrett Toans, individually and as
Commissioner of Social Services; and Frankie Wallingsford,
individually and as Director of the Office of Alcohol and
Drug Abuse Prevention, Appellees.
Brenda JACKSON and Rose White, Appellants,
v.
ARKANSAS DEPARTMENT OF HUMAN SERVICES/YOUTH SERVICES
DIVISION, Appellee.
 Nos. 84-2540, 84-2573.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 15, 1985.
Decided April 9, 1986.
As Amended on Denial of Rehearing
and Rehearing En Banc
July 16, 1986.
 
 Richard Quiggle and John Walker, Little Rock, Ark., for appellants.
 Kay J. Jackson Demailly, Asst. Atty. Gen., Little Rock, Ark., for appellees.
 Before HEANEY, Circuit Judge, HENLEY, Senior Circuit Judge, and McMILLIAN, Circuit Judge.
 HENLEY, Senior Circuit Judge.
 
 
 1
 Appellants in these consolidated employment discrimination actions contest the district court's[1] decertification of two of three classes, dismissal of the remaining class, and dismissal of their individual claims. We affirm in part, reverse in part and remand in part with directions.
 
 
 2
 This case represents the consolidation of several individual and class claims of employment discrimination based on race or sex or both under 29 U.S.C. Sec. 206(d), 42 U.S.C. Secs. 1981, 1983 and 1985, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. Secs. 2000e et seq. Appellants are several employees and former employees of the Arkansas Department of Human Services (DHS), and its agencies, the Division of Youth Services (DYS) and the Division of Rehabilitation Services (DRS). The appellees are DHS, DYS, DRS and several officials of those agencies.
 
 
 3
 Appellants and appellees stipulated to the following definitions for three potential classes:
 
 
 4
 1. All Black applicants for employment with the Division of Rehabilitation Services between July 26, 1975 and August 30, 1982.
 
 
 5
 2. All Black and female employees of the Department of Human Services who have been denied promotions between April 15, 1976 and August 30, 1982.
 
 
 6
 3. All Black employees of the Division of Youth Services who have been terminated between July 1, 1977 and August 30, 1982.
 
 
 7
 After trial, the court issued lengthy findings of fact and conclusions of law which discussed in detail all claims. The court decertified the applicant class (class one above), but found in favor of applicant plaintiffs Walter Jaudon and Johnny Clark Watson. The court also decertified the termination class (class three above), but found in favor of termination plaintiff Dale Charles. Finally, the court dismissed the promotion class (class two above) and all remaining individual claims. Appellants now attack the court's judgment on several grounds.
 
 
 8
 I. DECERTIFICATION.
 
 
 9
 The first issue on appeal is whether the court abused its discretion in decertifying the hiring and termination classes after trial and prior to a decision on the merits. See Roby v. St. Louis Southwestern Railway Co., 775 F.2d 959, 961 (8th Cir.1985) (holding that standard of review for decertification of class is abuse of discretion). We, of course, do not give blanket approval to delay when, as here, grounds for decertification are known to the court prior to trial. However, in light of the trial court's duty to ensure that class representation is adequate and proper at all times during a class action, see General Telephone Co. v. Falcon, 457 U.S. 147, 160, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982); Sessum v. Houston Community College, 94 F.R.D. 316, 322 (S.D.Tex.1982), we find that the timing of the decertifications was not error.[2] In any event, the delay in this case was harmless to the appellants.[3]
 
 
 10
 The stipulated definition of the applicant class was as follows: "All Black applicants for employment with the Division of Rehabilitation Services between July 26, 1975 and August 30, 1982." Appellants contend that Walter Jaudon, who filed the original action in this somewhat jumbled mass of litigation, and Johnny Clark Watson, an intervenor in Jaudon's action, were proper representatives of this class.
 
 
 11
 The court decertified the applicant class for two reasons. First, the court noted that while Jaudon's complaint made class allegations, neither Jaudon nor Watson ever moved for class certification. In East Texas Motor Freight System, Inc. v. Rodriguez, 431 U.S. 395, 405, 97 S.Ct. 1891, 1897, 52 L.Ed.2d 453 (1977), the Supreme Court observed that:
 
 
 12
 [e]ven assuming, as a number of courts have held, that a district judge has an obligation on his own motion to determine whether an action shall proceed as a class action, [citations omitted] named plaintiffs' failure to protect the interests of class members by moving for certification surely bears strongly on the adequacy of the representation that those class members might expect to receive.
 
 
 13
 Second, the court pointed out that Jaudon's action was allowed to be consolidated with Briggs (the lead case in this litigation) on the express condition that it proceed as an individual action. We have recognized that " 'consolidation is permitted as a matter of convenience and economy in administration, but does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another. (Footnotes omitted.)' " DeGraffenreid v. General Motors Assembly Division, St. Louis, 558 F.2d 480, 486 (8th Cir.1977) (citing Johnson v. Manhattan Railway Co., 289 U.S. 479, 496-97, 53 S.Ct. 721, 727-28, 77 L.Ed. 1331 (1933) ). We therefore cannot say that the court abused its discretion. The court found that neither Jaudon nor Watson could satisfy the class action requirements of Fed.R.Civ.P. 23(a), and it properly decertified the applicant class.
 
 
 14
 The stipulated definition of the termination class was as follows: "All Black employees of the Division of Youth Services who have been terminated between July 1, 1977 and August 30, 1982." Appellants contend that Homer Winstead, Janie Allen, Dale Charles, Delaney Fleming, Sandy Savannah Carter and Melvin Clayton were proper representatives of this class.
 
 
 15
 "A fundamental requirement of representatives in a class action is that they must be members of the [classes] they seek to represent." Roby, 775 F.2d at 961. (Citations omitted.) As in Roby, testimony in this case revealed that Homer Winstead, Sandy Savannah Carter and Janie Allen were not members of the termination class. The court specifically found that Winstead retired outside of the relevant time frame, that Carter voluntarily resigned,[4] and that Allen voluntarily resigned and was not with Youth Services at the time. These findings are not clearly erroneous. See Fed.R.Civ.P. 52(a); Anderson v. City of Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985).
 
 
 16
 Dale Charles filed an individual action and also intervened in Allen's action. In his individual action, Charles moved for class certification. When the court requested additional information, however, Charles abandoned his motion and filed a motion to consolidate with Briggs. His motion was granted and his action properly proceeded as an individual action only. See DeGraffenreid, 558 F.2d at 486. Therefore, as the plaintiff in that action Charles could not properly represent the termination class.
 
 
 17
 Charles, Fleming and Clayton were all intervenors in Allen's action. Neither Fleming nor Clayton ever filed EEOC actions or moved for class certification. While it is true that every class member need not file an EEOC action, it is also true that the class representative must have filed an EEOC charge in order to have standing to raise the appropriate issues for those class members who did not. See Allen v. Amalgamated Transit Union Local 788, 554 F.2d 876, 882 (8th Cir.), cert. denied, 434 U.S. 891, 98 S.Ct. 266, 54 L.Ed.2d 176 (1977); Oatis v. Crown Zellerbach Corp., 398 F.2d 496, 499 (5th Cir.1968). Fleming and Clayton did not have standing and neither of them could properly represent the class. In addition, neither Fleming nor Clayton ever moved for class certification, and this failure bears directly on compliance with Fed.R.Civ.P. 23. Rodriguez, 431 U.S. at 405, 97 S.Ct. at 1897.
 
 
 18
 Having found no appropriate class representative for either the applicant or termination classes and having noted inadequate compliance with Fed.R.Civ.P. 23, the trial court decertified those two classes. We find no abuse of discretion and therefore affirm the decertification of the hiring and termination classes.
 
 
 19
 II. CLASS PROOF.
 
 
 20
 Having affirmed the decertification of the hiring and termination classes, it is unnecessary for us to review the court's findings regarding the class evidence in those two classes. We therefore turn our attention to the court's findings regarding the evidence in the promotion class.
 
 
 21
 The stipulated definition of the promotion class was as follows: "All Black and female employees of the Department of Human Services who have been denied promotions between April 15, 1976 and August 30, 1982." Discriminatory intent is the key issue under Title VII, Sec. 1981 and Sec. 1983, see Craik v. Minnesota State University Board, 731 F.2d 465, 468 n. 5 (8th Cir.1984); Taylor v. City of St. Louis, 702 F.2d 695, 697 (8th Cir.1983), and in order to make out a case of classwide employment discrimination, appellants needed to "prove by a preponderance of the evidence that the defendant engaged in a pattern or practice of unlawful discrimination in various company policies, that 'discrimination was the company's standard operating procedure--the regular rather than the unusual practice.' " Craik, 731 F.2d at 470 (quoting International Brotherhood of Teamsters v. United States, 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977) ).
 
 
 22
 Appellants attempted to meet this burden at trial with the testimony of several named plaintiffs and class members, and also with the testimony of several officials of DHS. They did not choose to produce statistical evidence comparing promotions among similarly situated minority and non-minority employees. After reciting detailed findings of fact for each witness, the court concluded that appellants had not met their burden of proof as set out in Craik. Appellants challenge this holding on several grounds.
 
 
 23
 Appellants first contend that the court erroneously assumed that it was essential for them to produce statistical evidence and that the court was deceived by appellees' statistical evidence. We observe that while statistical evidence is not essential in proving employment discrimination, it is normally used in this type of case. Id. at 470. We can find nothing in the court's decision which indicates that it in any way punished appellants for not producing statistical evidence. Indeed, if there was punishment, appellants punished themselves by choosing other and perhaps more difficult methods of proving classwide discrimination.
 
 
 24
 The court credited statistics produced by appellees showing that in 1980-81 81.39% of promotions in DHS went to blacks and female whites, and that the figure was 82.9% in 1981-82. Appellants claim that statistical evidence in general, and this evidence in particular, can be deceptive. While in a sense that may be true, we are not prepared to agree with appellants that a data base consisting of promotions denied would have been more appropriate, and we cannot say that the court's decision to credit appellees' statistical evidence was clearly erroneous. See Fed.R.Civ.P. 52(a); Anderson, 105 S.Ct. at 1512.
 
 
 25
 Next, appellants contend that the court erroneously ignored admissions by DHS administrative officials concerning historical and ongoing discrimination, over-representation of protected classes in low level positions, under-representation of protected classes in high level positions, the use of discriminatory and unvalidated educational and experience requirements for positions, the use of subjective criteria in promotion decisions, and the use of affirmative action plans only to mask discrimination. Appellants contend that these admissions established a prima facie case of classwide discrimination, and that the court's findings to the contrary are clearly erroneous. We cannot agree.
 
 
 26
 It is not entirely clear that all of the statements of officials were admissions because none of the officials except DHS Commissioner Baxter was a party opponent. We need not address this question, however, because it is the role of the trier of fact to decide what weight will be given to testimony and we presume that the district court decided the case on the basis of admissible evidence. See Meyer v. United States, 638 F.2d 155, 158 (10th Cir.1980) (court refused to reevaluate weight to be given to admissible evidence because to do so "would require us to substitute our judgment for that of the trial court"); Employers Mutual Casualty Co. v. Mosqueda, 317 F.2d 609, 612-13 n. 4 (5th Cir.1963) (admissions are mere evidence and the weight to be given them is a matter for the trier of fact). In reviewing the parts of the transcript cited to us by appellants, we note several legitimate reasons for the court's comment that the testimony of these officials did not bolster appellants' case. The most frequently occurring problem with these admissions is that most of them are only opinions or guesses. When asked about ongoing discrimination, the use of unvalidated educational and experience requirements for positions, and other alleged discriminatory DHS conduct, many of the officials stated that they had never seen any evidence on which to base their statements.[5]
 
 
 27
 We can sympathize with the trial court's reluctance to base a finding of classwide discrimination by DHS on this kind of evidence, and we cannot say that that court's decision to give little weight to these admissions was clearly erroneous. See Fed.R.Civ.P. 52(a); Anderson, 105 S.Ct. at 1512. See also Grebin v. Sioux Falls Independent School District No. 49-5, 779 F.2d 18, 19-20 (8th Cir.1985) (ignored admissions did not render court's decision clearly erroneous).
 
 
 28
 Finally, appellants contend that their proof as a whole was sufficient to establish a prima facie case of employment discrimination against DHS and that the court's findings to the contrary are clearly erroneous. The only evidence presented by appellants that has not yet been addressed is the testimony of several named plaintiffs and anecdotal witnesses.
 
 
 29
 This testimony indicated that each of these witnesses had applied for one or more promotions during the relevant time frame and that promotions were denied each time. The court set out in detail its findings with respect to each of these witnesses, and in every case it found that appellees had legitimate, nondiscriminatory reasons for denying the promotions. The two reasons noted most frequently were that the employee did not meet the minimum educational and/or experience requirements for the position, as in Thompson v. McDonnell Douglas Corp., 552 F.2d 220, 222 (8th Cir.1977), and that a more qualified employee received the promotion. We cannot say that these findings were clearly erroneous.
 
 
 30
 We recognize that appellants have made some plausible arguments with respect to the promotion class and that these arguments are not without a basis in the record, but the findings of the trial court also have a firm basis in the record. That court made an acceptable choice between two plausible views of the evidence, and its findings are entitled to respect here. See Fed.R.Civ.P. 52(a); Anderson, 105 S.Ct. at 1512.
 
 
 31
 III. INDIVIDUAL CLAIMS.
 
 
 32
 The appellants challenge the court's findings regarding all remaining individual claims of named plaintiffs. In reviewing the court's findings as to these individual claims, we are once again limited to reversing only if those findings are clearly erroneous. See Fed.R.Civ.P. 52(a); Anderson, 105 S.Ct. at 1512.
 
 
 33
 In all disparate treatment cases brought under Title VII, the individual plaintiff must basically prove that he is a member of a protected class and has been treated less favorably than others in circumstances which give rise to an inference of intentional discrimination. See Craik, 731 F.2d at 469. Different specific prima facie case inquiries have been developed for different aspects of employment, but they all follow this basic pattern. The inquiry into intentional discrimination is essentially the same for individual actions brought under Secs. 1981 and 1983, and we will therefore confine the discussion to Title VII. See id. at 468 n. 5; Taylor, 702 F.2d at 697.
 
 
 34
 A. TERMINATION.
 
 
 35
 In affirming the decertification of the termination class, we upheld the court's findings that Janie Allen, Homer Winstead and Sandy Savannah Carter all voluntarily resigned or retired. They are therefore not entitled to individual relief on their termination claims. We now turn our attention to Melvin Clayton, Thomas Broughton and Delaney Fleming, the only remaining named plaintiffs with individual termination claims.
 
 
 36
 Since the court properly decertified the termination class, Clayton and Fleming did not benefit from the burden shifting presumption of Craik, 731 F.2d at 470-71. See also Roby, 775 F.2d at 963. In order to have established prima facie cases in their individual termination claims, each needed to show that "(1) he is a member of a protected class; (2) he was capable of performing his job satisfactorily; and (3) he was discharged." Johnson v. Yellow Freight System, Inc., 734 F.2d 1304, 1307 (8th Cir.), cert. denied, --- U.S. ----, 105 S.Ct. 525, 83 L.Ed.2d 413 (1984) (citations omitted).
 
 
 37
 Once the plaintiff establishes a prima facie case, the burden of coming forward with a legitimate nondiscriminatory reason for the employment decision in question shifts to the employer. Upon the articulation by the employer of such a reason, the burden shifts back to the plaintiff to prove, by a preponderance of the evidence, that the reasons articulated by the employer are in fact a mere pretext for unlawful discrimination.
 
 
 38
 Johnson, 734 F.2d at 1307.
 
 
 39
 Clayton testified that he suffered from arthritis, and that on one occasion while he was a houseparent at Pine Bluff he notified his supervisor that he would be unable to work his shift due to pain in his hand. He stated that he was told to take aspirin and report to work or he would be fired. His supervisor testified that Clayton had used all of his accumulated leave. He told Clayton that they could not do without him on his shift, and that he would only need to sit and would not be called upon to use his hand. He then told Clayton to take aspirin and report to work.
 
 
 40
 Clayton did not report to work and he was terminated on August 29, 1978. Clayton's doctor sent a letter to the supervisor explaining Clayton's condition. This letter caused the supervisor to reverse his decision to terminate Clayton. He testified that he called Clayton on September 11, 1978 and told him to report to work that evening. Clayton claimed that the call never took place.
 
 
 41
 Clayton claimed to have received two letters from his supervisor on September 18. The first was dated September 11 and advised him that he had been reinstated and should return to work on the date of the letter. The second was dated September 13, and cited the telephone conversation of September 11. The letter further advised Clayton that he was once again terminated for failure to report to work on September 11.
 
 
 42
 Clayton's attorney sent a letter to DYS explaining that Clayton did not report to work on September 11 because he did not receive the letters until September 18. DYS Commissioner Dick Powell sent a letter to Clayton on October 12 advising him of a hearing on his termination on October 16 in Little Rock. Clayton was not present at the hearing and contended that he did not receive Powell's letter until the day of the hearing. He notified DYS of this excuse for his absence and he was advised to set up a new hearing date. He never attempted to set up a new date for his appeals hearing.
 
 
 43
 The court found that race was not a factor in Clayton's termination. Clayton's original termination was justified because he failed to report to work and he failed to follow proper procedure for obtaining time off for illness. After Clayton's condition was properly documented, he was promptly reinstated. Misunderstandings followed, but DYS made every effort to clear up Clayton's employment situation. We cannot say that the court's findings regarding Melvin Clayton's termination were clearly erroneous.
 
 
 44
 Fleming was one of two "Placement Specialists" at DYS's Alexander Youth Services Center. The number of placements became insufficient to justify having two "Placement Specialist" positions, and the decision was made to transfer one of the positions. At the time of this decision, Fleming had experience equal to that of the other "Placement Specialist" but his performance was less satisfactory in comparison. In addition, the record reflects that Fleming often undermined the authority of numerous houseparents with their assigned youth and frequently acted inappropriately and beyond the scope of his duties as "Placement Specialist."
 
 
 45
 DYS has a set number of employment positions. While an employee may be transferred with his position into a different job, an employee may not move to another open position without going through the DHS application process. The only place where extra help was needed was in security, and Fleming was transferred, along with his position, to "Security Officer III." He did not lose grade or pay.
 
 
 46
 In keeping with his long history of disciplinary problems at DYS, Fleming refused training and work assignments and was terminated as a result. On appeal, he presented evidence of health problems that rendered him unable to perform his new duties. His position was not needed in any other area, and therefore no other transfer was possible. DYS Commissioner Gordon was exceedingly kind when he testified that Fleming was a valued employee and that the decision to uphold his termination was unavoidable. Other positions in jobs comparable to "Placement Specialist" were open at the time of Fleming's transfer, but he never applied for them. The court found that race was not a factor in Fleming's termination. Fleming's capability of performing his assigned job duties was doubtful at best, and he had a long history of disciplinary problems. The court's findings regarding Delaney Fleming's termination were therefore not clearly erroneous.
 
 
 47
 Since Thomas Broughton was terminated when he was with DRS, he was not a member of the termination class. His burden of proof on his termination claim was therefore the same as that of Clayton and Fleming. The trial court correctly found that Broughton's termination was due to a reduction in force and that race was not a factor. Nothing of merit in the record supports a holding that the court's findings regarding Thomas Broughton's termination were clearly erroneous and we forego further discussion of the claim.
 
 
 48
 No other witness has an individual termination claim before us for consideration. Harold Jackson, Evirta Lee Johnson, Ella Peterson, Mary Sue Kemp and Corneida Lovell served only as anecdotal witnesses and were not named plaintiffs or intervenors in any of these consolidated actions.[6] Furthermore, Peterson, Kemp and Lovell are not members of the stipulated termination class. Since none of these individuals was a named plaintiff or intervened in any of the actions, they may only recover as class members. Clark v. Chrysler Corp., 673 F.2d 921, 929 (7th Cir.), cert. denied, 459 U.S. 873, 103 S.Ct. 161, 74 L.Ed.2d 134 (1982); McDowell v. Safeway Stores, Inc., 575 F.Supp. 1007, 1067 (E.D.Ark.1983), aff'd, 753 F.2d 716 (8th Cir.1985). Jackson and Johnson were members of the termination class, and the decertification of that class bars their recovery here. Peterson, Kemp and Lovell were never members of a class in this case and therefore cannot recover. While we note that the court's findings regarding the terminations of these individuals likely were not clearly erroneous, we decline to reach the merits of their claims so as not to bar future individual actions. We therefore affirm the court's dismissal of all individual termination claims before us for review.
 
 
 49
 B. APPLICANT AND PROMOTION.
 
 
 50
 Since the court properly decertified the applicant class and found that appellants failed to make a prima facie case regarding the promotion class, none of the individual applicant or promotion plaintiffs benefited from the Craik burden shifting presumption. Roby, 775 F.2d at 963. The individual plaintiffs therefore needed to prove "that [they] belong[ed] to a protected class, applied for ... available job[s] for which [they were] qualified, but [were] rejected under circumstances which allow the court to infer unlawful discrimination." Craik, 731 F.2d at 469. See also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The burden then shifts to the defendant to articulate legitimate, nondiscriminatory reasons for the employment decisions. If the defendant proves such legitimate reasons, the burden then shifts back to the plaintiffs to show that the reasons are pretextual. Craik, 731 F.2d at 469.
 
 
 51
 Curtis Long, Gary Rogers, Judy Kerr, Reginald Henderson, Teresa Baxter, Louise Baltimore, Jesse Gatewood, Arlen Jones, Barbara Wallace, Jannice Bush, Gwendolyn Wright, Mary Tomlin, Ella Peterson, Mary Sue Kemp, Harold Jackson, Sandy Savannah Carter and Corneida Lovell all testified, as anecdotal witnesses, to having been denied promotions. Evirta Lee Johnson and Rupert Hemphill testified to having been denied employment after application. While the court's findings as to these individuals were likely not clearly erroneous, we need not reach the merits of their claims. None of these individuals was a named plaintiff or intervenor in any of these consolidated actions, and, as indicated, they can only recover as class members. Since the applicant and promotion classes were properly disposed of by the court, these individuals cannot recover in this case. Clark, 673 F.2d at 929; McDowell, 575 F.Supp. at 1067.
 
 
 52
 Cedell Briggs complained of not being promoted from a position where she was functioning as a counselor aide to the position of counselor. The Counselor I position requires a college degree in psychology or a related field, and at no time has Briggs possessed a degree. While Briggs did perform some of the functions of a counselor, she at no time performed or was capable of performing all of those functions. The required degree is necessary to acquire knowledge in human behavior, and skills in testing and in dealing with groups and difficult problems. Briggs failed to show that she applied for a position for which she was qualified, and she also failed to show that the degree requirement did not "bear a demonstrable relationship to successful performance of the [job] for which it is used." Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). The court's findings regarding Cedell Briggs' promotion claims were not clearly erroneous.
 
 
 53
 Melvin Clayton claimed to have applied for a houseparent position with DYS shortly after receiving his college degree in 1977. He claimed that he was interviewed for the position but was never notified afterward. Greg Lord, a white male, was hired in the position, and DYS has no record of Clayton's application or interview. It is DYS's standard policy to keep all applications on file and to interview all applicants whose qualifications come close to meeting the job requirements. Clayton failed to prove that he applied for this position.
 
 
 54
 Later, in November of 1977, Clayton was hired as a houseparent at DYS's Wrightsville Unit. He applied for a transfer to a houseparent position at the Pine Bluff Unit in January of 1978, and the position was awarded to John Craigg, a white male. Clayton claimed that Craigg had no experience with DYS, but Craigg in fact had seven months experience at Aldersgate, a similar youth institution in Little Rock dealing with troubled children. A panel consisting of one black male and two white males unanimously selected Craigg as being better qualified. The court found that race was not a factor in Melvin Clayton's failure to receive this transfer, and the court's findings regarding Clayton's promotion claims were not clearly erroneous.
 
 
 55
 Delaney Fleming applied for two promotions in 1978 and two in 1979. One of these positions was filled by Dale Charles, a black male. The other three were filled by better qualified white females. We also note that frequent complaints and disciplinary problems regarding Fleming most likely contributed to these promotion decisions. The court found that race was not a factor in promotion decisions regarding Delaney Fleming, and the court's findings are not clearly erroneous.
 
 
 56
 Rose White complained of two promotion denials. White had a high school education and began her state employment in 1972 as a Clerk-Stenographer with Juvenile Services.[7] As the result of several promotions and upgrades, she reached the position of Bookkeeper III by 1976. In 1977 she was promoted to Accountant I. White did not possess the required Bachelor's degree in accounting or a business related field, but her experience was substituted for that requirement by the Qualifications Review Committee at the request of her supervisor.
 
 
 57
 In 1978 White applied for an Accountant II position. The minimum requirements for that position were the same as those for Accountant I. Neither White nor F.D. Smith, the white male awarded the position, met the minimum degree requirement. Smith, however, had an associate degree in Business Administration and had auditing and accounting experience with the Department of Revenue and with DYS. Smith was clearly more qualified than White.
 
 
 58
 White argues, however, that she was judged to have met the minimum qualifications for Accountant I, and that she therefore automatically met the qualifications for Accountant II. She concludes that she was a qualified applicant for the position and that it was awarded to an unqualified white male. We cannot agree with White's contention. We cannot see why the substitution of experience for education in one instance should have a res judicata type of effect. It is logical and not facially discriminatory for the Qualifications Review Committee to consider qualification substitution anew regarding each new position for which an employee applies. In other words, qualification substitution for an employee once does not necessarily lead to automatic qualification substitution each time an employee applies for a new position. Here, neither applicant met the minimum requirements, and the more qualified received the position.
 
 
 59
 White was subsequently passed over for the same position in favor of a black male. The more qualified applicant received the position in that instance also. In 1981 White applied for a Subgrant Administrator II position. White contends that she was obviously qualified because she was interviewed. She did not possess the required education for the position. A black female who met the degree requirement and was more qualified received the position. Rose White failed to establish a prima facie case of discrimination, and the court's findings regarding her promotion claims were not clearly erroneous.
 
 
 60
 Brenda Jackson complained first of being denied promotion to a Subgrant Administrator III position in late 1979. Arlen Jones, a black male, and Virginia Bonner, a white female, received Subgrant Administrator III positions over Jackson. It is doubtful that either Jones or Bonner met the minimum qualifications for the Subgrant Administrator III position.
 
 
 61
 The minimum qualifications for Subgrant Administrator III were as follows:
 
 
 62
 The formal education equivalent of a Bachelor's degree in business administration, management or related field; plus three years experience in planning, program administration or related field, one of which must be with subgrant programs.
 
 
 63
 Jones had a Bachelor's degree in Sociology and a Master's degree in Secondary Education. These degrees are probably not in "related fields," as that term is used in the minimum qualifications. Jones had at least six years of experience in dealing with federal grants and coordinating and monitoring federal programs. Bonner had a Bachelor's degree in Speech Communication, and this degree is also probably not in a "related field." She had twenty months experience as a Subgrant Administrator II, but her total planning and grant experience fell one or two months short of the required three years.
 
 
 64
 Jackson, however, also did not technically satisfy the minimum qualifications. Jackson had a Bachelor's degree in Business Administration, and she had four years experience as an Accountant I and one year experience as an Accountant II. Whether Jackson had any grant experience is a contested issue, but even if she did, she did not have experience in "planning, program administration or related field."
 
 
 65
 It appears that none of the applicants technically satisfied the minimum qualifications, and that absent those requirements the trial court's findings to the effect that Jones and Bonner were the two most qualified applicants for the Subgrant Administrator III position were not clearly erroneous.
 
 
 66
 In 1980 Kay Joiner and Liz Rainwater, two white females, were hired into Subgrant Administrator III positions. Once again, none of the applicants[8] technically satisfied the minimum qualifications, but absent those requirements Joiner and Rainwater were the most qualified applicants for the positions. The court's findings to that effect were not clearly erroneous.
 
 
 67
 Jackson applied in 1980 for the position of Educational Coordinator. Arlen Jones was obviously more qualified for the position due to his Master's degree in Secondary Education. Jackson apparently does not contest the court's findings regarding this position, and those findings were not clearly erroneous.
 
 
 68
 In October of 1981 Jackson applied for a Fiscal Manager position. The minimum qualifications for this position were as follows:
 
 
 69
 The formal education equivalent of a Bachelor's Degree in Public Administration; Management; General Business; Finance; Accounting or related fields; plus three years progressively more responsible experience in a supervisory or leadership capacity.
 
 
 70
 Phillip Hoots, a white male, received the position.
 
 
 71
 While Jackson's Bachelor's degree in Business Administration did satisfy the minimum degree requirement, Hoots' educational qualifications were far superior. Hoots not only had a Bachelor's degree, but also a Master's degree in Public Administration and several hours towards a Doctor of Philosophy degree. While Hoots' experience in management was impressive to say the least,[9] the district court found that it totaled only two and one-half years. He had an additional six months of experience with the State in non-supervisory positions. Jackson arguably had three years experience in a supervisory position.[10] Jackson therefore may have been minimally qualified for the position while Hoots was not.
 
 
 72
 We recognize that an inference of discrimination might be drawn from DYS's possible variance from its written job qualifications to hire a technically unqualified white male over an arguably qualified black female, but we feel that the agency met its burden in articulating a legitimate, nondiscriminatory reason for this employment decision. DYS needed a person in the Fiscal Manager position with strong managerial experience. While Hoots' two and one-half years of experience did not technically meet the minimum qualifications, his managerial experience was very strong. Almost all of Jackson's experience was supervisory rather than managerial. DYS's reason for varying from its written requirements in this employment decision was not discriminatory or pretextual.[11] The court's findings regarding the promotion claims of Jackson were not clearly erroneous.
 
 
 73
 The court's findings regarding the promotion claims of Linda Nimmer and Janie Allen were not clearly erroneous. The dismissal of their claims will be affirmed without further discussion.
 
 
 74
 The court's findings regarding the promotion claims of John Lewellen and Thomas Broughton contain errors which require remand. The court found that Lewellen applied for a Staff Development Supervisor position in 1974, and that Hayward Hill, a black male, received the position. The record indicates that Lewellen applied for this position twice. A.J. Baker and Carol Cato obtained the positions, and Hayward Hill appears not to have been involved. The court's finding regarding Lewellen's 1974 application was therefore clearly erroneous, and we remand for appropriate new findings and decision on possible discrimination against Lewellen in that instance. The remainder of the court's findings regarding John Lewellen's promotion claims contains no clear error.
 
 
 75
 The court found that Broughton applied for a Staff Development Supervisor position in 1974, and that A.J. Baker, a white male, received the position. The court here made no findings as to whether Baker was more qualified. The court simply found that this application was outside of the relevant class period and did not discuss the matter further. The relevant class period does not place a time limitation on individual claims. The only time limitations on the individual claims in these cases are the appropriate limitation for Secs. 1981 and 1983, and the Title VII time frame limitation (180 days prior to filing EEOC charge). As in the case of Lewellen, we hold that the court's finding regarding Broughton's 1974 application is clearly erroneous. We remand for appropriate new findings and decision on the question whether consideration of this application is time-barred and the question whether the hiring of Baker over Broughton was discriminatory. In the remainder of the court's findings regarding Broughton's promotion claims we find no clear error.
 
 
 76
 Bonnie Brown alleged that she failed to receive several promotions for which she applied. The court found that she applied for a Bookkeeper II position in 1977, and that Don Taylor, a white male with a college degree, received the position. Brown did not possess a college degree. While it appears that the more qualified applicant received the position, we feel that Brown may have been the victim of employment discrimination. Brown stated that the Purchasing Agent in charge of making this employment decision, Ms. Bobbie Riffle, told her that she wanted a male for the position. This testimony was unrebutted and raised the issue of whether sex was a discernible factor in this particular promotion decision. A mixed motive question is therefore presented which seems not to have been considered by the court.
 
 
 77
 We recently discussed mixed motive employment decisions in Bibbs v. Block, 778 F.2d 1318 (8th Cir.1985) (en banc), stating:
 
 
 78
 [O]nce the plaintiff has established a violation of Title VII by proving that an unlawful motive played some part in the employment decision or decisional process, the plaintiff is entitled to some relief. ... However, even after a finding of unlawful discrimination is made, the defendant is allowed a further defense in order to limit the relief. The defendant may avoid an award of reinstatement or promotion and backpay if it can prove by a preponderance of the evidence that the plaintiff would not have been hired or promoted even in the absence of the proven discrimination.
 
 
 79
 Id. at 1323-24 (footnote omitted). We therefore remand with respect to the 1977 Bookkeeper II position. The court is instructed to consider and decide whether Brown sufficiently proved that sex was a discernible factor in this promotion decision. If a violation of Title VII is found, judgment should be entered for Brown and an appropriate remedy should be fashioned pursuant to the procedure set out in Bibbs. In the remainder of the court's findings regarding Brown's promotion claims we discern no clear error.
 
 
 80
 C. EQUAL PAY.
 
 
 81
 Cedell Briggs and Linda Nimmer also alleged discrimination with respect to pay. In order to have made out prima facie cases of sex discrimination with respect to pay, Briggs and Nimmer had to "show that [they were] paid less than a member of a different [sex] was paid for work requiring substantially the same responsibility." Pittman v. Hattiesburg Municipal Separate School District, 644 F.2d 1071, 1074 (5th Cir.1981).
 
 
 82
 Briggs complained that she was performing the work of a counselor while being paid as a counselor aide. The court found that Briggs at no time performed all of the duties of a counselor. We note that the record shows that Briggs was probably not capable of performing some of the counselor functions. The court also found that with the exception of one brief period, Briggs has always been paid at several grades above other counselor aides. While the court did not make specific equal pay findings, it did make relevant findings which were not clearly erroneous and are sufficient to show that Briggs failed to prove her claim. She was not performing the same work as counselors, and even if she were, she failed to prove under the Pittman test that being paid at a lower grade than a counselor constituted sex discrimination. She offered no evidence that similarly situated males were being paid more. We therefore find that Briggs failed to prove her equal pay claim and that the court's failure to make specific equal pay findings was harmless.
 
 
 83
 Nimmer complained that she was promoted to a Bookkeeper II position at Grade 11 and that this same position was a Grade 14 when occupied by her white male predecessor. Nimmer was not qualified for a Bookkeeper II position. She was told that if she accepted the promotion the position would be downgraded to Grade 11, the work would not be as complex as normal, and she would receive on-the-job training. She willingly agreed to accept the downgraded position. Her duties were later audited by the Office of Personnel Management, and her position was found to properly be a Grade 11.
 
 
 84
 Nimmer further complained that DHS never intended to advance her to Grade 14, as they had done for her predecessor. The evidence does not support this contention. DHS had to bend the rules in order to give her the promotion, and she should not now be heard to complain about the grade of a position that she knowingly and very willingly accepted. She was in fact later promoted to Accountant I, Grade 14, and she was also not qualified for that position.
 
 
 85
 The court made relevant findings which are sufficient to show that Nimmer failed to prove her equal pay claim. These findings were not clearly erroneous and the court's failure to make specific equal pay findings was harmless. The dismissal of the equal pay claims of both Briggs and Nimmer are affirmed.
 
 
 86
 IV. COMMENTS REGARDING DHS.
 
 
 87
 Although we have affirmed the trial court's dismissal of the promotion class, we feel that some further discussion of appellees' educational and experience requirements for jobs is needed. Nothing in the record clearly indicates that any of the job requirements or the requirement substitution procedures are being applied by DHS in an invidiously discriminatory manner. To the contrary, in some instances the requirements appear to have been interpreted in such fashion as to favor deserving minority persons. It troubles us however, that so many of the witnesses in this case were denied promotions because they could not meet the minimum educational and/or experience requirements for the new position. It further troubles us that some DHS administrative officials hold the opinion, speculative though it may be, that these requirements may tend to have a disparate impact on minorities. Still more troubling is the fact that these requirements have never been the subject of a validation study to ensure that they are legitimately related to the skills necessary to perform the relevant jobs.
 
 
 88
 In Griggs, 401 U.S. at 430-31, 91 S.Ct. at 853, the Supreme Court discussed discriminatory job criteria as follows:
 
 
 89
 Congress did not intend by Title VII, however, to guarantee a job to every person regardless of qualifications. In short, the Act does not command that any person be hired simply because he was formerly the subject of discrimination, or because he is a member of a minority group. Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed. What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification.
 
 
 90
 The Court went on to say that any job criteria which is proved to have a disparate impact on minorities must be shown "to bear a demonstrable relationship to successful performance of the jobs for which it is used." Id. at 431, 91 S.Ct. at 853.
 
 
 91
 We have held that a prima facie case of disparate impact with regard to employment criteria is made by showing one or more of the following:
 
 
 92
 the adverse impact of the requirement on blacks as a class in the relevant geographical area; the number of blacks who are in fact disqualified by reference to the requirement; and the number of blacks who meet or are actually hired in spite of the requirement.
 
 
 93
 Rice v. City of St. Louis, 607 F.2d 791, 794-95 (8th Cir.1979) (footnote omitted). Appellants only proved that a handful of employees were denied promotions because they could not meet appellees' requirements, and they did not approximate a prima facie case of disparate impact under Rice.
 
 
 94
 Appellees, however, should take little comfort from appellants' failure. It is common knowledge that due in part to past discrimination certain minority groups have not had equal educational opportunities, and therefore almost any educational requirement for a job is likely to have some adverse impact on some members of minority groups. Many minority employees of DHS may have had little or no experience, and therefore any experience requirement for a job may tend to have adverse impact on their promotion prospects.
 
 
 95
 A plaintiff who had the requisite proof and sued the proper state agency[12] might well have a chance at invalidating at least some of the educational and experience requirements for state employment. Government officials of the State of Arkansas should be very concerned. They may have dodged a bullet here only to have the next one strike them between the eyes. In order to guard against such an unfortunate occurrence, we strongly suggest that the appropriate authority[13] see to it that educational and experience requirements utilized by the State are validated and updated. Such a process might well be conducted not only for the purpose of maintaining a valid and realistic relationship between the job classifications and needed skills but also with an eye toward minimizing possibility of discrimination. For now, we can only assume that what should be done will be done.
 
 
 96
 We also feel that a brief discussion of the alleged discriminatory work atmosphere at DHS is needed. Appellants state that they proved numerous instances of racial slurs occurring in DHS. They contend that these instances created a discriminatory work atmosphere and constituted violations of Title VII. While a few such instances were mentioned in testimony, we cannot say that there was an " 'atmosphere of racial discrimination and of prejudice ... so pervasive and so long continuing ... that the employer must have become conscious of it.' " Taylor v. Jones, 653 F.2d 1193, 1199 (8th Cir.1981) (quoting district court's findings in Taylor v. Jones, 489 F.Supp. 498, 500 (E.D.Ark.1980)). Such isolated, casual ethnic slurs are unfortunate, but they cannot be attributed to the employer without further proof. We find no error in the court's treatment of this issue.
 
 
 97
 V. CONCLUSION.
 
 
 98
 In summary, we find no abuse of discretion in the court's decertification of the applicant and termination classes and we affirm the court's dismissal of the promotion class. Due to our reluctance to bind potential class members by this decision, however, we hold that none of the class claims is dismissed with prejudice.
 
 
 99
 We reverse the court's dismissal of the individual promotion claims of John Lewellen, Thomas Broughton and Bonnie Brown, and we remand those claims for further proceedings consistent with this opinion. The dismissal of the remaining individual claims of named plaintiffs and intervenors is affirmed, and the court's dismissal is without prejudice to the numerous witnesses who were neither named plaintiffs nor intervenors.
 
 
 
 [1]
 The Honorable Henry Woods, United States District Judge, Eastern District of Arkansas
 
 
 [2]
 It is questionable whether the classes or only the class definitions were stipulated in this case. Nevertheless, we note that the stipulations did not affect the court's continuing duty to scrutinize class representation and compliance with Fed.R.Civ.P. 23, and the court's power to decertify remained intact
 
 
 [3]
 We will, however, remind the trial court of an earlier promise that "[i]n the future I will more carefully examine each motion for class certification even though a stipulation is presented." Hervey v. City of Little Rock, 101 F.R.D. 45, 56 (E.D.Ark.1984)
 
 
 [4]
 Testimony of Sandy Savannah Carter:
 A. I had pneumonia in March and I was off for 15 days....
 * * *
 Q. While you were in the hospital I think you indicated that if you--you were told that if you didn't get back to work you would be terminated.
 A. Right.
 Q. Were you terminated?
 A. I wasn't terminated then. I--they discharged me from the hospital at an earlier date and I just barely beat the deadline.
 I was told I'd better be back by Monday, and I think they let me out on Friday.
 * * *
 Q. Were you let out of the hospital before you were actually ready to--
 A. No, I wasn't. I wasn't let out before I was ready.
 * * *
 Q. Okay. When did you finally quit your employment?
 A. Well, I left the 12th of September, 1979.
 * * *
 * * *
 Q. That was a medical disability at that time?
 A. Yes, ma'am.
 
 
 [5]
 An example is found in the testimony of Betty Scull:
 Q. Can you tell me whether or not those educational requirements have, what you would call, a disparate impact upon blacks in terms of hiring or promotion?
 A. I have not done any formal analyses, if I may say that.
 
 
 [6]
 Reginald Henderson was not a named plaintiff or intervenor, and the court's findings regarding his termination from DYS are not challenged by appellants
 
 
 [7]
 Juvenile Services is one of the predecessors of DYS
 
 
 [8]
 The court found in successive paragraphs that Jackson did apply for these positions and that she did not apply for these positions. These findings are obviously ambiguous, but they are also harmless since we have assumed that Jackson did apply. We note, however, that the evidence showing that she did apply is highly questionable
 
 
 [9]
 Hoots' resume reflected that from September, 1978 to September, 1979 he was a Subgrant Administrator for the Arkansas Department of Local Services and managed over seven million dollars in grant awards. From February, 1980 to September, 1981 he was an Administrative Services Manager for the A.C.C.E.P.T. Program and managed a model program with a budget of five hundred thousand dollars
 
 
 [10]
 About two and one-half years of Jackson's experience was as an Accountant II. A portion of the Accountant II job description reads as follows:
 
 
 [5]
 MAY SUPERVISE TWO OR MORE BOOKKEEPERS AND/OR CLERICAL EMPLOYEES: instructs the methods of performing work; assigns duties; verifies completed work
 We suspect that this is not the type of supervisory position referred to in the minimum qualifications for the Fiscal Manager job.
 
 
 [11]
 It is also helpful to note that after Hoots became dissatisfied with the Fiscal Manager position and subsequently resigned, Jackson was promoted to that position in July of 1982
 
 
 [12]
 We note that job classifications and specifications are controlled by the Uniform Classification and Compensation Act, Ark.Stat.Ann. Secs. 12-3201-3212 (Supp.1985). This law authorizes the Office of Personnel Management, Department of Finance and Administration, to establish and administer minimum qualifications for state jobs. The Office of Personnel Management therefore may be an appropriate defendant for an attack on educational and experience requirements. Even if disparate impact had been proved in this case, it is not clear that an order against DHS would completely solve the problem. DHS has little or no control over the contested requirements
 
 
 [13]
 Potentially, there appears to be an appropriate authority. Under Ark.Stat.Ann. Sec. 12-3206(7) (Supp.1985), the Office of Personnel Management has the specific duty "[t]o revise as necessary with the advice of the Arkansas Legislative Council the 'Minimum Education and Experience' requirements for all class specifications in order to maintain a valid relationship between such requirements and the duties and responsibilities of the jobs."