Melvin **HICKS**, Appellant,

v.

**ST. MARY'S HONOR CENTER, DIVISION OF ADULT INSTITUTIONS OF THE DEPARTMENT OF CORRECTIONS AND HUMAN RESOURCES OF THE STATE OF MISSOURI, Steve Long, Appellees.**

No. 91–1571.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 13, 1991.

Decided July 23, 1992.

Rehearing and Rehearing En Banc
Denied Sept. 3, 1992.

Charles R. Oldham, St. Louis, Mo., argued, for appellant.

Gary L. Gardner, Jefferson City, Mo., argued (William L. Webster and Gary L. Gardner, on the brief), for appellees.

Before McMILLIAN and JOHN R. GIBSON, Circuit Judges, and HUNTER,* Senior District Judge.

McMILLIAN, Circuit Judge.

Melvin Hicks ("plaintiff") appeals from a final judgment entered in the United States District Court for the Eastern District of Missouri, after a bench trial, in favor of St. Mary's Honor Center ("St. Mary's") and Steve Long (together "defendants") on the merits of his racial discrimination claim against St. Mary's under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. 2000e *et seq.*, and his equal protection claim against Long under 42 U.S.C. § 1983.[1] *Hicks v. St. Mary's Honor Center,* 756 F.Supp. 1244 (E.D.Mo.1991). On plaintiff's behalf, the Equal Employment Opportunity Commission ("EEOC") has appeared in this appeal as an amicus curiae. For reversal, plaintiff and the EEOC argue that the district court erred in holding that plaintiff failed to meet his burden of proving racial discrimination even though he had established a prima facie case of discrimination and had proven by a preponderance of the evidence that defendants' proffered nondiscriminatory reasons for demoting and terminating him were pretextual. For the reasons stated below, we reverse the judgment of the district court and remand the case with directions.

### Facts

The following summarizes the facts as found by the district court. St. Mary's is a minimum security correctional facility operated by the Missouri Department of Corrections and Human Resources ("MDCHR"). Plaintiff, an African–American, was hired as a correctional officer at St. Mary's in August 1978. He was promoted to shift commander, a supervisory position, in February 1980.

Starting in 1983, MDCHR began investigating the administration of St. Mary's in response to complaints about poor mainte-

---

* The Honorable Elmo B. Hunter, Senior United States District Judge for the Western District of Missouri, sitting by designation.

1. A third claim brought by plaintiff against both St. Mary's and Long under 42 U.S.C. § 1981 was dismissed on the merits after the district court granted partial summary judgment in defendants' favor on December 7, 1989. The dismissal of that claim is not part of this appeal.

nance, inadequate security, and other concerns at the facility. As a result, several persons at the upper levels of St. Mary's administration were demoted or terminated, and new people were hired. Among the changes that were made, defendant Long became the superintendent of St. Mary's. John Powell became the chief of custody and plaintiff's immediate supervisor. Long and Powell are both white.

Prior to 1984, plaintiff had a satisfactory employment record. Plaintiff's supervisors had consistently rated his performance as competent. He had not been suspended, written up, or otherwise disciplined.[2] In early 1984, however, plaintiff became the subject of a series of disciplinary actions, based upon three separate incidents occurring in March of that year. The disciplinary actions led to his termination on June 7, 1984.

On March 3, 1984, while plaintiff was on duty as shift commander, two transportation officers observed a number of violations of institutional rules. One of the two transportation officers, Edward Ratliff, submitted a written report about these violations to Powell. A disciplinary review board met and recommended that plaintiff be suspended for five days. Plaintiff was given the five-day suspension. Other officers who were also responsible for the violations were not disciplined. Powell testified that it was his policy to discipline only the shift commander for violations which occur during a shift. 756 F.Supp. at 1247.

On March 19, 1984, plaintiff gave two correctional officers permission to use a St. Mary's vehicle. Neither the correctional officers nor the control center officer on duty at the time logged the use of the car, despite an institutional rule requiring such logging. Powell sought disciplinary action against plaintiff. A disciplinary review board met on April 6, 1984, and voted to recommend that plaintiff be demoted for failing to insure that the use of the car was logged. Powell, who was on the disciplinary board, voted to terminate plaintiff.

Plaintiff was demoted to correctional officer I. Neither the control officers who borrowed the car, nor the control officer on duty, was disciplined. *Id.* at 1247.

On March 21, 1984, while plaintiff was still a shift commander, two inmates were involved in a brawl. One of the two inmates was injured and required emergency medical treatment. After learning that the inmate had been injured in a fight, plaintiff drafted a memorandum to Powell notifying him of the fight and the inmate's injury. Plaintiff ordered the correctional officer who had escorted the injured inmate to the hospital to write a report on the incident. On March 24, 1984, Powell submitted a report to Long charging plaintiff with failure to investigate the assault. On March 29, 1984, Powell gave plaintiff a letter of reprimand, citing failure to investigate the assault as the violation. *Id.* at 1247.

On April 19, 1984, plaintiff was notified of his demotion during a meeting with Long, Powell, and Vincent Banks, the assistant superintendent. After hearing the news, plaintiff requested and was granted the day off. As plaintiff was leaving, Powell followed him and ordered him to open his locker so Powell could take plaintiff's shift commander manual. Plaintiff refused and the two men exchanged heated words. Plaintiff then indicated that he would "step outside" with Powell.[3] Powell warned him that his words could be perceived as a threat. Plaintiff then left. Powell sought disciplinary action on grounds that plaintiff had threatened him. A disciplinary board was convened and recommended a three-day suspension. Long disregarded their vote and instead recommended termination; he testified that this recommendation was based upon the accumulation and severity of plaintiff's violations. On June 7, 1984, plaintiff was terminated. *Id.* at 1247–48.

By contrast, when plaintiff filed a report in April 1984 recommending that correctional officer Arthur Turney be disciplined for insubordination to a supervisor, after

---

2. Once, in 1980, plaintiff was mistakenly written up as absent without notice. He was on vacation at the time. 756 F.Supp. at 1246 n. 4.

3. The district court concluded that "Powell followed [plaintiff] and provoked him into behaving irrationally." 756 F.Supp. at 1251.

Turney cursed plaintiff with highly profane language because of a poor service rating, no disciplinary action was taken against Turney. Powell concluded that Turney was "merely venting justifiable frustration." *Id.* at 1248, 1251 n. 17.[4]

During this same period from January through June 1984, plaintiff reported violations of institutional rules on numerous occasions but his reports were generally ignored. For example, plaintiff reported to Powell an incident in which transportation officer Ratliff allowed his brother to bring a gun into the correctional facility without checking it at the front desk, despite specific instructions from plaintiff that the gun should be checked. Powell took no disciplinary action. Plaintiff later notified Powell of an incident in which Ratliff instructed an inmate to climb over a wall into Steve Long's locked office so Ratliff could obtain some inmate work passes that were inside. Despite the security breach, Powell did not seek discipline of Ratliff.[5] On two occasions in March, plaintiff arrived at work to find the front desk unattended. Apparently both times the shift commander on duty was aware of the front desk officer's absence and had ordered the control center officer to open and close the front door. Plaintiff reported these violations but nobody—including the shift commander, Sharon Hefele—was disciplined. Nor was Hefele disciplined when, on another occasion, plaintiff reported that he found two doors that were supposed to be locked at all times left open under her command. Plaintiff also reported an incident in April

1984 in which a correctional officer, John Newland, took a set of St. Mary's keys home with him; no discipline followed. Another incident occurred in April 1984 in which an inmate escaped due to a correctional officer's admitted negligence. The officer, Michael Doss, received only a letter of reprimand. *Id.* at 1248.

Turney, Ratliff, Hefele, Newland, and Doss are all white. *Id.* at 1246 n. 3, 1248 n. 8, 1248 n. 12, 1248 nn. 13 & 14.

During the period from December 1983 to December 1984, approximately twelve blacks and one white were fired at St. Mary's. During this period, the number of blacks hired at St. Mary's was approximately the same as the number of blacks fired. 756 F.Supp. at 1249.[6]

## Discussion

■ Plaintiff's Title VII claim against St. Mary's and his § 1983 claim against Long were jointly tried by the district court after plaintiff waived his right to a jury trial on the § 1983 claim. In its memorandum opinion, the district court addressed the Title VII claim first and then disposed of the § 1983 claim under the same analysis, reasoning that "the elements of the cause of action are the same under both [Title VII and § 1983]." 756 F.Supp. at 1253. We agree with the district court that the elements of plaintiff's discrimination claim against Long are the same as those which he must prove against St. Mary's under Title VII. *See Richmond v. Board*

---

4. The district court observed "Powell, however, was considerably more sensitive as the victim of insubordination." 756 F.Supp. at 1251 n. 17.

5. According to the district court, Powell actually praised Ratliff for his quick thinking in "diffusing a volatile situation." 756 F.Supp. at 1248 n. 10.

6. The district court's findings do not, however, specify the levels of position at which these black individuals were hired and fired. Nor did the district court make relative comparisons of the treatment of blacks versus whites at specific positions. According to plaintiff, of the ten white employees who were on the custody roster at St. Mary's as of April 1984, five were promoted. Plaintiff additionally contends that

the breakdown of blacks hired and fired demonstrates discrimination against blacks in *supervisory* positions. Plaintiff also introduced evidence at trial of a study performed in 1980 and 1981 of two honor centers in St. Louis and Kansas City. According to the district court's findings, this study concluded that "too many blacks were in positions of power at St. Mary's, and that the potential for subversion of the superintendent's power, if the staff became racially polarized, was very real." However, none of the witnesses for the defense admitted to being aware of the study at the time of the 1984 personnel changes at St. Mary's. 756 F.Supp. at 1249.

*of Regents,* 957 F.2d 595, 598 (8th Cir.1992) (burden of showing prima facie case of discrimination is the same under Title VII, § 1981, § 1983, or the Age Discrimination in Employment Act (ADEA)); *Briggs v. Anderson,* 796 F.2d 1009, 1021 (8th Cir. 1986) (*Briggs*) (inquiry into intentional discrimination for individual actions brought under §§ 1981 and 1983 is essentially the same as inquiry under Title VII); *Craik v. Minnesota State Univ. Bd.,* 731 F.2d 465, 468 n. 5 (8th Cir.1984) (*Craik*) (issue of discriminatory intent is common to analyses under Fourteenth Amendment, § 1983, and Title VII).

■ It is undisputed that Long was personally involved in demoting and terminating plaintiff and that his acts were causally connected to plaintiff's demotion and termination. 756 F.Supp. at 1253 ("Steve Long recommended the demotion and termination of plaintiff in his capacity as superintendent of a state correctional facility.") Moreover, St. Mary's and Long were jointly represented at trial, and they relied on the same evidence in defending the discrimination claims against them. Thus, under the circumstances of this case, to the extent plaintiff prevails on his Title VII claim against St. Mary's, he is equally entitled to relief against Long under § 1983. *See Irby v. Sullivan,* 737 F.2d 1418, 1425 (5th Cir.1984) (individual may be held personally liable under § 1983 if he or she was personally involved in the unconstitutional conduct or there was a causal connection between the individual's acts and the constitutional violation). Accordingly, we confine our discussion to the common issue of whether plaintiff proved a Title VII violation on grounds that defendants intentionally discriminated against him on the basis of race. *See Briggs,* 796 F.2d at 1021

(confining discussion of Title VII and § 1983 claims to Title VII analysis because issue of discriminatory intent is common to both); *Craik,* 731 F.2d at 468 n. 5 (same).

Because plaintiff's Title VII claim was based upon a disparate treatment theory, the district court analyzed this claim under the framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (*McDonnell Douglas*), and *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (*Burdine*). The *McDonnell Douglas–Burdine* disparate treatment analysis proceeds in three stages. First, the plaintiff has the initial burden of establishing a prima facie case of disparate treatment, thus creating an inference of discrimination. *Burdine,* 450 U.S. at 253–54 & n. 6, 101 S.Ct. at 1094 & n. 6. In the present case, the district court found that "[p]laintiff proved a prima facie case of race discrimination." 756 F.Supp. at 1249.[7]

Next, the defendant may rebut the presumption by articulating a legitimate, nondiscriminatory reason or reasons for the adverse employment action. "It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine,* 450 U.S. at 254–55, 101 S.Ct. at 1094. The district court found that defendants had "set forth essentially two reasons for the adverse employment actions: the severity and the accumulation of violations committed by plaintiff." 756 F.Supp. at 1250.[8]

At the final stage, the plaintiff is given the opportunity to prove that the defendant's stated reasons were not the true reasons—and therefore are a mere pretext—for the adverse employment action.

---

**7.** Plaintiff's prima facie case was based upon the facts that plaintiff was black and therefore a member of a protected class; he was qualified for the position of shift commander; he was demoted from shift commander to correctional officer, and then was terminated; and his position remained open and was presently filled by a white male. 756 F.Supp. at 1249. *See also McDonnell Douglas Corp. v. Green,* 411 U.S. 792,

802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) (setting forth elements of a typical prima facie case).

**8.** Long testified that his recommendation to terminate plaintiff was based upon the severity and accumulation of plaintiff's violations. 756 F.Supp. at 1248.

The plaintiff retains the burden of persuasion. She now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.

*Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. At this stage of the analysis in the present case, the district court held "[p]laintiff has proven that the reasons proffered by defendant are pretextual." 756 F.Supp. at 1250. Indeed, the district court outlined the evidence for some three pages before again stating that "[p]laintiff has carried his burden in proving that the reasons given for his demotion and termination were pretextual." *Id.* at 1251. The district court considered the facts that plaintiff was "mysteriously" the only one disciplined for violations actually committed by his subordinates; that the alleged policy of disciplining only the shift commander for violations occurring during a shift was only applied to plaintiff's shifts; and that, on numerous occasions, plaintiff was singled out for unusually harsh disciplinary treatment while others who committed more serious violations either were not disciplined or were treated more leniently. *Id.* at 1250-51. Yet a third time, the district court summed up and made clear that plaintiff had succeeded in proving the violations were pretextual reasons for his demotion and discharge. *Id.* at 1252.

The district court, however, went on to state:

> [A]lthough plaintiff has proven the existence of a crusade to terminate him, he has not proven that the crusade was racially rather than personally motivated.... [P]laintiff has succeeded in proving that the violations for which he was disciplined were pretextual reasons for his demotion and discharge. Plaintiff has not, however, proven by direct evidence or inference that his unfair treatment was motivated by his race.

*Id.* at 1252. We hold that, by reaching this ultimate conclusion, the district court erred in its analysis.

■ First, it was improper for the district court to assume—without evidence to support the assumption—that defendants' actions were somehow "personally motivated." As the district court noted, defendants articulated only two legitimate, non-discriminatory reasons for their actions (the severity and the accumulation of violations), and both were discredited by plaintiff as pretextual. While we question whether such a hypothetical reason based upon *personal* motivation even could be stated and still be "legitimate" and "non-discriminatory," we need not address that question because defendants simply never stated that personal motivation was a reason for their actions or offered evidence to substantiate such a claim. In order to satisfy its burden at the second stage of the *McDonnell Douglas–Burdine* analysis, "the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection." *Burdine*, 450 U.S. at 255, 101 S.Ct. at 1094.

■ Once plaintiff proved all of defendants' proffered reasons for the adverse employment actions to be pretextual, plaintiff was entitled to judgment as a matter of law. Because all of defendants' proffered reasons were discredited, defendants were in a position of having offered no legitimate reason for their actions. In other words, defendants were in no better position than if they had remained silent, offering no rebuttal to an established inference that they had unlawfully discriminated against plaintiff on the basis of his race.

A prima facie case under *McDonnell Douglas* raises an inference of discrimination only because we presume these

acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.... And we are willing to presume this largely because we know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting. Thus, when all legitimate reasons for [the adverse employment action] have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with *some* reason, based [its] decision on an impermissible consideration such as race.

*Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978) (citation omitted); *see Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095.

In this circuit, if the plaintiff has met his or her burden of proof at the pretext stage—that is, if the plaintiff has proven by a preponderance of the evidence that all of the defendant's proffered nondiscriminatory reasons are not true reasons for the adverse employment action—then the plaintiff has satisfied his or her ultimate burden of persuasion. No additional proof of discrimination is required. *See Williams v. Valentec Kisco, Inc.,* 964 F.2d 723, 727–28 (8th Cir.1992) (rejecting the so-called "pretext-plus" approach); *Adams v. Nolan,* 962 F.2d 791, 795 & n. 7 (8th Cir.1992) (same); *Brooks v. Monroe Systems for Business, Inc.,* 873 F.2d 202, 204 (8th Cir.) (under ADEA, submission of discredited reason for adverse employment action is itself evidence of discriminatory motive), *cert. denied,* 493 U.S. 853, 110 S.Ct. 154, 107 L.Ed.2d 112 (1989); *MacDissi v. Valmont Indus., Inc.,* 856 F.2d 1054, 1059 (8th Cir. 1988) (under ADEA, rejecting the argument that "even if [the defendant's] proffered reasons for firing [the plaintiff] were not its true reasons, [the plaintiff] must still prove intentional discrimination, in-

stead of merely discrediting [the defendant's] defense").

In the present case, the district court made an unequivocal factual finding that plaintiff had satisfied his burden of proving that the reasons articulated by defendants for his demotion and discharge were pretextual. The only reason given by the district court for failing to enter judgment based on this finding of pretext was the requirement that plaintiff additionally prove by direct evidence or inference that the treatment was motivated by race, which we have found contrary to the law. The record of the district court thus contains the necessary findings to compel a conclusion that plaintiff is entitled to judgment as a matter of law. The numerous cases of the Supreme Court, including *McDonnell Douglas, Burdine,* and *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983), as well as our decisions which have followed them, make clear that plaintiff may succeed by proving pretext. The district court found that he had done so. Plaintiff is therefore entitled to recover.

Accordingly, we reverse the judgment of the district court on the merits of plaintiff's Title VII claim against St. Mary's and his § 1983 claim against Long.[9] The district court shall enter judgment for plaintiff accordingly. We remand the case to the district court for further findings on the remaining issues, including damages.

---

**9.** Having reversed the district court on the basis of plaintiff's disparate treatment theory, we need not reach the question of whether the

district court erred in failing to address plaintiff's alternative theory of retaliatory discharge as a separate basis for Title VII liability.