756 F.Supp. 1244 (1991)
Melvin HICKS, Plaintiff,
v.
ST. MARY'S HONOR CENTER, et al., Defendants.
No. 88-109 C (5).
United States District Court, E.D. Missouri, E.D.
January 31, 1991.
*1245 Charles R. Oldham, Anne V. Maloney, St. Louis, Mo., for plaintiff.
Gary L. Gardner, Jefferson City, Mo., for defendants.

MEMORANDUM
LIMBAUGH, District Judge.
Plaintiff filed a three-count complaint against defendant St. Mary's Honor Center ("St. Mary's") and defendant Steve Long. Defendant St. Mary's is a minimum security correctional facility operated by the Missouri Department of Corrections and Human Resources ("MDCHR"). Defendant Steve Long was the superintendent of St. Mary's from January 7, 1984 to May 16, 1985. In Count I plaintiff alleges that St. Mary's violated Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq. by demoting and then terminating plaintiff because of his race. In Count II plaintiff alleges that St. Mary's and Steve Long violated 42 U.S.C. § 1981. On December 7, 1989 the Court entered summary judgment in favor of defendants and against plaintiff on the merits of Count II. In Count III plaintiff alleges that Steve Long violated 42 U.S.C. § 1983 by demoting and then terminating plaintiff because of his race.
The case was tried before the court on June 5, June 6, and June 14, 1990. The *1246 Court, having considered the pleadings, the testimony of the witnesses, and the documents in evidence, hereby makes the following findings of fact and conclusions of law as required by Fed.R.Civ.P. 52.

I. FINDINGS OF FACT
Plaintiff began working at St. Mary's in August, 1978 as a correctional officer I. Plaintiff was promoted to shift commander in February, 1980. In late 1983 Arthur Schulte was superintendent at St. Mary's, and Vincent Banks was assistant superintendent. Gilbert Greenlee was chief of custody. Plaintiff and Carl MacAvoy were shift commanders; Charles Woodard served as an acting shift commander.[1]
In 1983, George Lombardi, the assistant director of the Division of Adult Institutions of MDCHR, received numerous complaints from inmates, former inmates, staff, legislators and other citizens concerning conditions at St. Mary's. Lombardi placed an undercover investigator at St. Mary's to observe how the institution was being run. Lombardi also made a series of unannounced visits and found a poorly maintained institution with substandard upkeep, inadequate security measures, and no effective rules or regulations. Lombardi instructed Schulte to improve conditions, but Schulte failed. In January, 1984 Lombardi demoted and transferred Schulte to another correctional institution. Schulte was replaced by Steve Long. Other personnel changes at St. Mary's were also made. Gilbert Greenlee was demoted and transferred. Carl MacAvoy and Charles Woodard were terminated. John Powell, replaced Greenlee as chief of custody.[2] Sharon Hefele replaced Charles Woodard as a shift commander; J.R. Wilson replaced Carl MacAvoy as a shift commander.[3] After the personnel changes, Lombardi found remarkable improvements in the manner that St. Mary's was run.
Prior to January, 1984 plaintiff had a satisfactory employment record. Plaintiff's supervisors consistently rated plaintiff's performance as competent, and plaintiff was not suspended, written up, or otherwise disciplined.[4] Plaintiff, however, became subject to frequent discipline after he was placed under the supervision of John Powell.
On March 3, 1984 plaintiff was the shift commander on the first shift. Plaintiff's hours on duty were 11:30 p.m. to 7:30 a.m. During plaintiff's shift Edward Ratliff and Frank Slinkard, transportation officers at St. Mary's, arrived to pick up inmates who were scheduled to work that day at jobs outside St. Mary's. When Ratliff and Slinkard attempted to enter St. Mary's, they found that there was no officer present at the front door.[5] Elvis Thomas, the control center officer, momentarily left his assigned post to open the front door. After Ratliff and Slinkard entered St. Mary's, they noticed that the first floor lights were off. Plaintiff, who was performing a perimeter check of the premises, and correctional officer Charles Kennedy were not present when Ratliff and Slinkard entered St. Mary's.
Ratliff wrote an incident report to John Powell concerning the violations of institutional rules he observed during his March 3, 1984 visit to St. Mary's. The violations brought to Powell's attention included (1) the front door officer being away from his position, (2) the control center officer leaving his post to open the front door, (3) the absence of Charles Kennedy, and (4) the lights being off on the first floor. A fourperson disciplinary review board, composed of two whites and two blacks, met and *1247 recommended that plaintiff be given a five-day suspension.[6] In accordance with the disciplinary review board's recommendation, plaintiff was suspended for five days. Treglown was not disciplined for being away from his post. Thomas was not disciplined for leaving his post. Kennedy was not disciplined for being absent for a substantial period of time. Powell testified that it is his policy to discipline only the shift commander for violations which occur during his shift.
On March 19, 1984 Don Moore, a correctional officer, was ordered during his first shift to work a double shift. Moore had driven a borrowed automobile to work that day, and had to return it to a friend at the end of his first shift. Moore asked plaintiff if another correctional officer could follow Moore to his friend's house in a St. Mary's vehicle, and then drive Moore back to St. Mary's. Plaintiff ordered correctional officer Jimmie Davis to follow Moore in a St. Mary's vehicle. Institutional rules require that each use of a St. Mary's vehicle be entered into a log. Neither Don Moore, Jimmie Davis, nor the control center officer entered into the log book the use of the St. Mary's vehicle.
Powell recommended that plaintiff be disciplined for failing to log the use of the St. Mary's vehicle. On April 6, 1984 a four-person disciplinary review board, composed of two blacks and two whites, convened and voted to recommend the demotion of plaintiff.[7] In accordance with the disciplinary review board's recommendation, plaintiff was demoted from shift commander to correctional officer I. Plaintiff was not disciplined for authorizing the use of the vehicle, but instead for failing to insure it was logged. Neither Moore, Davis, nor the control center officer were disciplined for failing to log the use of the vehicle.
On March 21, 1984 two inmates were involved in a brawl in which one, Mark Valenti, was injured and received emergency medical treatment. After the brawl Valenti told plaintiff that he injured himself lifting weights. On the way to the hospital Valenti admitted to correctional officer William Garrett that he was punched in the chest by inmate Allen Johnson. On March 21, 1984 plaintiff drafted a memorandum to John Powell informing him that there was a fight between Valenti and Johnson and Valenti was injured. Plaintiff ordered Garrett to submit a report.
On March 24, 1984 Powell submitted a report to Steve Long in which he charged plaintiff with a failure to investigate the assault. Powell stated: "Although the medical out count was logged, and a memorandum was submitted on this matter, NO ACION [sic] was taken by the Shift Commander in investigating the seriousness of the assault or the after effects on the residents involved." On March 29, 1984 Powell gave plaintiff a letter of reprimand for failing to investigate the incident.
On April 19, 1984 plaintiff was notified of his demotion during a meeting with Steve Long, Vincent Banks, and John Powell. Plaintiff was shaken by the news, and requested the rest of the day off. Steve Long granted plaintiff's request. As plaintiff attempted to exit Powell followed him and ordered plaintiff to open his locker so Powell could obtain the shift commander's manual. Plaintiff refused, and the two exchanged heated words. Plaintiff indicated he would "step outside" with Powell, and Powell warned plaintiff that his words could be perceived as a threat. After several tense minutes, plaintiff left.
Powell sought disciplinary action against plaintiff for the "threats" plaintiff made against him during the April 19, 1984 confrontation. On May 9, 1984 a four-person disciplinary board, composed of at least two blacks, convened and voted to suspend plaintiff for three days. Steve Long, however, *1248 disregarded their vote and recommended termination. Long testified that he based his decision on the severity and accumulation of plaintiff's violations. On June 7, 1984 plaintiff was terminated.
During the period from January 1984 to June 1984, plaintiff brought numerous violations of institutional rules by co-workers to the attention of his superiors. On February 4, 1984, while plaintiff was shift commander, Ratliff entered St. Mary's with his brother, a deputy marshal.[8] Ratliff's brother asked whether he should check his gun. Although plaintiff stated that the gun should be checked, Ratliff informed his brother that he need not check his gun while inside St. Mary's. Plaintiff reported the incident to Powell. Powell's position was that squabbles between a shift commander and his subordinates should be handled without the intervention of the chief of custody. Ratliff was not disciplined for disobeying his supervisor.
During Ratliff's visit to St. Mary's on March 3, 1984 to pick up inmates, he discovered that the inmates' work passes were locked inside Steve Long's office. To obtain the work passes Ratliff instructed an inmate to climb over the wall into Steve Long's office and unlock the door.[9] Plaintiff brought this incident to the attention of Powell. Ratliff was not disciplined for permitting an unescorted inmate access to Steve Long's office.[10]
On March 8, 1984 plaintiff reported for work and noted that there was no officer stationed at the front door. On March 13, 1984 plaintiff again arrived at work and noted the front door officer was absent. Plaintiff inquired about the absence of the front door officer. Don Smith, the control center officer, said that shift commander Sharon Hefele ordered him to open and close the front door.[11] On March 13, 1984 and March 14, 1984 plaintiff reported these incidents. No one was disciplined for the violations.
On April 12, 1984 correctional officer Michael Doss was the acting shift commander of the third shift.[12] Doss was ordered to remove inmate Theodore Hammond from a detention cell and transport him to the City Jail immediately. Doss was sluggish in carrying out these orders and the inmate escaped. Doss admitted that he was negligent in the performance of his duties, and that his negligence was a cause of the escape. Doss, however, received only a letter of reprimand as discipline.
On April 4, 1984 plaintiff reported that correctional officer John Newland took a set of St. Mary's keys home with him.[13] After Newland was contacted by the control center officer, he returned the keys and stated that he forgot the keys were in his pocket. Newland was not disciplined for the violation.
On April 7, 1984 plaintiff reported that during the shift of Sharon Hefele the doors to the main power room and the annex building, which are always supposed to be locked, were left open. Sharon Hefele was not disciplined for the violation.
On April 9, 1984 plaintiff met with correctional officer Arthur Turney to discuss Turney's service rating.[14] Turney, who was unsatisfied with his rating score, became indignant and cursed plaintiff with highly profane language. On April 17, 1984 plaintiff filed a report recommending that Turney be disciplined for insubordination to a supervisor. After speaking with Turney, Powell concluded that Turney was merely venting justifiable frustration, and did not discipline Turney for the incident.
*1249 As was stated, supra, numerous personnel changes occurred at St. Mary's in 1984. In the period from December, 1983 to December, 1984 approximately twelve black employees were terminated. Only one white employee was terminated. During the course of 1984 Steve Long hired approximately the same number of blacks that were terminated. In January, 1984 thirty blacks were employed at St. Mary's. In December, 1984 twenty nine blacks were employed at St. Mary's.
In 1980 and 1981 James Davis performed a study of the honor centers in St. Louis and Kansas City. The Davis study is a comprehensive comparison of the two institutions which discussed the shortfalls and suggested means of improvement. In a section toward the end of the study Davis pointed out that too many blacks were in positions of power at St. Mary's, and that the potential for subversion of the superintendent's power, if the staff became racially polarized, was very real. No witness for the defendants admitted he was aware of the Davis study at the time of the 1984 personnel changes.

II. CONCLUSIONS OF LAW

A. Count I  Title VII

In Count I plaintiff alleges that St. Mary's violated Title VII by demoting and then terminating plaintiff because of his race. Under Title VII it is an unlawful employment practice for an employer to "discharge any individual or otherwise to discriminate against any individual with respect to his ... terms, conditions or privileges of employment because of such individual's race...." 42 U.S.C. § 2000e-2(a)(1). There are basically two types of actions under Title VII: disparate treatment and disparate impact. Disparate treatment occurs when an employer treats some people less favorably than others because of their race, color, religion, sex or national origin. International Brotherhood of Teamsters v. United States, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). The plaintiff in a "disparate treatment" case is required to prove that the defendant had a discriminatory intent or motive.
In McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) the Supreme Court set forth the basic allocation of proof in a Title VII case alleging discriminatory treatment. The plaintiff must first prove a prima facie case of race discrimination by a preponderance of the evidence. Id. at 802, 93 S.Ct. at 1824. Plaintiff may establish a prima facie case by showing that (1) he was within the protected class, (2) he met applicable job qualifications, (3) despite these qualifications, he suffered adverse employment action, and (4) after the adverse employment action the position remained open and the employer continued to seek applications from persons with similar qualifications. Id. If the plaintiff succeeds, then defendant must show a legitimate, non-discriminatory reason for the adverse employment action. Id. Finally, if the defendant succeeds, plaintiff must prove by a preponderance of the evidence that the reasons given by the defendant for the challenged employment action were pretextual. Id. at 804, 93 S.Ct. at 1825. "Despite these shifting burdens, the plaintiff retains throughout the case the ultimate burden of persuading the trier of fact that the employer discriminated against him [due to his race]." Chaffin v. Rheem Mfg. Co., 904 F.2d 1269, 1272-73 (8th Cir.1990) (citing Texas Dep't. of Community Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 1093-94, 67 L.Ed.2d 207 (1981)).
Plaintiff proved a prima facie case of race discrimination. First, plaintiff, who is black, is a member of a protected class. Second, plaintiff met the applicable job qualifications of a shift commander. At the time of his termination plaintiff had served as shift commander for approximately four years. Plaintiff maintained a satisfactory employment record until John Powell became chief of custody at St. Mary's. Until 1984 plaintiff was consistently rated as competent by his supervisors and had not been disciplined for misconduct or a dereliction of duty.
*1250 Third, plaintiff suffered adverse employment action when he was demoted from shift commander to correctional officer I in April, 1984 and terminated in June, 1984. Fourth, after plaintiff's demotion his position as shift commander remained open and was presently filled by a white male.
Because plaintiff succeeded in proving a prima facie case, defendant must set forth a legitimate, non-discriminatory reason for the adverse employment actions. Defendant has set forth essentially two reasons for the adverse employment actions: the severity and the accumulation of violations committed by plaintiff. Defendant asserts that the nature of plaintiff's violations were sufficiently severe to justify the discipline received. On March 3, 1984 plaintiff failed to adequately supervise the employees on his shift. The unsupervised employees abandoned their posts and left St. Mary's vulnerable to escape or knavery by the inmates. Violations of internal policy, such as this, which lead to breaches of security in a correctional institution are grounds for disciplining the employee responsible. Defendant also considered the numerous violations committed by plaintiff in a short period of time. The excessive accumulation of violations over a short period of time is a legitimate reason for increasing the severity of discipline with each violation committed.
Because defendant has succeeded in setting forth a legitimate, non-discriminatory reason for the adverse employment action, plaintiff must prove that the reasons given by defendant are pretextual. Pretext is a statement that does not describe the actual reasons for the decision. Mister v. Illinois C.G.R. Co., 832 F.2d 1427, 1435 (7th Cir.1987). Plaintiff has proven that the reasons proffered by defendant are pretextual. First, plaintiff was mysteriously the only person disciplined for violations actually committed by his subordinates. Plaintiff was given a five day suspension for the violations committed on March 3, 1984: (1) the front door officer being away from his position, (2) the control center officer leaving his post, (3) a correctional officer being absent, and (4) the lights on first floor being off. Don Treglown, the front door officer who was discovered balancing his check book in the break room, was not disciplined in any way. Elvis Thomas, the control center officer who left his post to open the front door, was not disciplined in any way. Charles Kennedy, the correctional officer absent for a substantial period of time, was not disciplined in any way.
Plaintiff was demoted for failing to log the use of a St. Mary's vehicle. The control center officer, who maintains the log book, was not disciplined in any way. Correctional officer Don Moore, who formally apologized for forgetting to log the use of the vehicle, was not disciplined in any way. Jimmie Davis, who drove the vehicle, was not disciplined in any way.
John Powell testified that it was his policy to discipline only the shift commander for violations which occurred on the commander's shift. Although the Court will not comment on the prudence of such a policy, plaintiff demonstrated such a policy only applied to violations which occurred on plaintiff's shift.
On April 7, 1984 plaintiff reported that during the shift of Sharon Hefele the doors to the main power room and the annex building were left open. Sharon Hefele, the shift commander, was not disciplined for the violation of a subordinate on her shift. On March 13 and March 14, 1984 plaintiff reported that twice during the shift of Sharon Hefele no front door officer was present.[15] The control center officer had to leave his post in order to open the front door for plaintiff. Again, Sharon Hefele was not disciplined for the violations that occurred on her shift.
Defendant asserts that the discipline plaintiff received was warranted by the severity of the violations. Plaintiff was demoted to correctional officer I for failing to insure that the authorized use of a vehicle *1251 was not properly logged. Steve Long testified, rather sheepishly, that he considered this a serious violation for which harsh discipline was justified. The Court does not seek to supplant the considered judgment of persons who have substantial experience in the administration of a correctional facility. The evidence reveals, however, that much more serious violations, when committed by plaintiff's co-workers, were either disregarded or treated much more leniently. Ed Ratliff permitted an unescorted inmate access to Steve Long's locked office. While behind a locked door the inmate had access to Long's private files. Also, the inmate could have acquired a weapon to use against a correctional officer or another inmate. Although the violation constitutes a striking and obvious breach of security, Powell not only refused to discipline Ratliff but praised him for "diffusing a volatile situation."
An inmate escaped during the shift of Michael Doss. Doss admitted that he was negligent in carrying out an order, and that his negligence permitted the escape. Although the escape of an inmate is clearly much more serious than the failure to log the authorized use of a vehicle, Doss was only given a letter of reprimand for the violation.[16]
During the shift of Sharon Hefele the doors to main power room were left open. An inmate who had access to the main power room could turn off the electricity and disable the security system. Although allowing inmates access to the main power room is certainly a more serious violation than the failure to log the authorized use of a vehicle, no one was disciplined for the violation.
The violation for which plaintiff was terminated involved plaintiff's making threats to Powell. Although the Court does not condone the threatening of one's supervisor, the evidence suggests that Powell manufactured the confrontation between plaintiff and himself in order to terminate plaintiff. After plaintiff was informed of his demotion, he was distressed and requested the day off. Steve Long granted the request. As plaintiff attempted to leave, Powell followed him and provoked him into behaving irrationally.[17]
Plaintiff has carried his burden in proving that the reasons given for his demotion and termination were pretextual. Although plaintiff committed several violations of institutional rules, plaintiff was treated much more harshly than his co-workers who committed equally severe or more severe violations.
Although plaintiff proved pretext, plaintiff still bears the ultimate burden to prove that race was the determining factor in defendant's decision. Plaintiff need not prove racial motivation by direct evidence; instead, plaintiff may offer circumstantial evidence sufficient to create an inference of racial motivation. Jaurequi v. Glendale, 852 F.2d 1128, 1134 (9th Cir.1988). It is clear that John Powell had placed plaintiff on the express track to termination. It is also clear that Powell received the aid of Ed Ratliff and Steve Long in this endeavor. The question remains, however, whether plaintiff's race played a role in their campaign.
Plaintiff demonstrated that he was being disciplined more harshly than his co-workers. It is not clear, however, that plaintiff's race was the motivation for the harsh discipline. Plaintiff was suspended for violations of institutional rules committed on March 3, 1984. Plaintiff's black subordinates who actually committed the violations: Elvis Thomas and Charles Kennedy, were not disciplined in any way. Plaintiff was demoted for failing to log the authorized *1252 use of a vehicle. Again, plaintiff's black subordinates who committed the violations: Don Moore and Jimmie Davis, were not disciplined in any way. Except for the letter of reprimand issued to correctional officer Michael Doss for permitting an escape, it appears that plaintiff was the only employee disciplined during the period for which evidence was presented. In essence, although plaintiff has proven the existence of a crusade to terminate him, he has not proven that the crusade was racially rather than personally motivated.
Plaintiff brought before the Court evidence of disproportionate firing of blacks at St. Mary's in 1984. In the period between January, 1984 and December, 1984, approximately twelve blacks were terminated. In the same period, only one white was terminated. During 1984, however, Steve Long hired thirteen blacks. In January, 1984 there were thirty blacks employed at St. Mary's. In December, 1984 there were twenty nine blacks employed at St. Mary's. Therefore, these personnel changes do not create an inference of racial discrimination because the number of black employees at St. Mary's remained constant during the period in question.
Before Steve Long became superintendent at St. Mary's, only the superintendent was white. The assistant superintendent, chief of custody, and three shift commanders were black. Shortly after Steve Long became superintendent, the assistant superintendent and plaintiff were the only blacks in a supervisory position on the custody side. These personnel changes, however, do not create an inference of racial discrimination for two reasons. First, the full-scale removal of employees from supervisory positions is often required when an institution is being poorly run. Before Steve Long became superintendent, George Lombardi was profoundly dissatisfied with the manner in which St. Mary's was managed. After allowing a period for corrective action, Lombardi commenced a purge of the institution. The fact that most of the supervisory staff was terminated or transferred is not alarming given the widespread problems that St. Mary's experienced under their control.
Second, prior to the 1984 personnel change there was one white and five blacks in supervisory positions. After Steve Long became superintendent, there were four whites and two blacks in supervisory positions. If the position of chief of custody was accepted by the black male to whom it was initially offered, there would have been three blacks and three whites in supervisory positions. It is not unusual that several black supervisors were replaced by whites because blacks held nearly all the supervisory positions before January, 1984.
There were black members of the disciplinary review boards who reviewed plaintiff's violations. Although the Court considers demotion a harsh remedy for failing to insure the logging of a vehicle, the disciplinary review board which recommended this discipline was composed of two blacks and two whites.
Finally, plaintiff introduced a 1981 study by James Davis of the Kansas City and St. Louis (St. Mary's) honor centers. In one section at the end of the study Davis compared the control of power at the two institutions by race, and warned that blacks possessed too much power at St. Mary's. Although heeding the warning of the Davis study would violate Title VII, neither Steve Long nor John Powell were aware of the existence of the study until after the 1984 personnel changes. Steve Long testified that he saw the study for the first time when it was presented to him at his deposition by opposing counsel.
In sum, plaintiff has succeeded in proving that the violations for which he was disciplined were pretextual reasons for his demotion and discharge. Plaintiff has not, however, proven by direct evidence or inference that his unfair treatment was motivated by his race. For the foregoing reasons, the Court enters judgment in favor of defendant St. Mary's and against plaintiff on the merits of Count I of plaintiff's complaint.

B. Count III42 U.S.C. § 1983

In Count III plaintiff alleges that defendant Steve Long violated 42 U.S.C. § 1983 by demoting and terminating plaintiff. *1253 Title 42 U.S.C. § 1983 is a vehicle for seeking a federal remedy for violations of federally protected rights. Foster v. Wyrick, 823 F.2d 218, 221 (8th Cir.1987). In order to state a cause of action under § 1983 plaintiff must allege that some person, acting under color of state law, has deprived him of a federally protected right. Gomez v. Toledo, 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980).
Steve Long recommended the demotion and termination of plaintiff in his capacity as superintendent of a state correctional facility. Therefore, Long acted under color of state law. Plaintiff alleges that Long violated the equal protection clause of the Fourteenth Amendment. "The central purpose of the equal protection clause of the fourteenth amendment is the prevention of official conduct discriminating on the basis of race." Washington v. Davis, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976). Protection from racial discrimination in employment is provided for by the equal protection clause as well as Title VII.[18]Foster, supra, 823 F.2d at 218. Therefore, plaintiff has alleged the violation of a federally protected right.
When § 1983 is used as a parallel remedy with Title VII in a racial discrimination suit, the elements of the cause of action are the same under both statutes. Irby v. Sullivan, 737 F.2d 1418, 1431 (5th Cir.1984). In accordance with the analysis set forth, supra, the Court enters judgment in favor of defendant Steve Long and against plaintiff on the merits of Count III of plaintiff's complaint.

ORDER
In accordance with the memorandum filed herein this day,
IT IS HEREBY ORDERED that judgment is entered in favor of defendant St. Mary's Correctional Center and against plaintiff on the merits of Count I of plaintiff's complaint.
IT IS FURTHER ORDERED that judgment is entered in favor of defendant Steve Long and against plaintiff on the merits of Count III of plaintiff's complaint.
NOTES
[1] Arthur Schulte is white. Plaintiff, Vincent Banks, Gilbert Greenlee, Carl MacAvoy and Charles Woodard are black.
[2] The position of chief of custody was initially offered to a black male who refused the position.
[3] John Powell, Sharon Hefele, and J.R. Wilson are white.
[4] In 1980 plaintiff was written up for being absent without notice. Plaintiff, however, was on vacation at the time.
[5] Ratliff and Slinkard later found Don Treglown, the front door officer, balancing his checkbook in the break room.
[6] The disciplinary review board makes a recommendation to the superintendent. The superintendent, in turn, makes a recommendation to the Director of MDCHR. The Director of MDCHR makes the ultimate decision concerning discipline.
[7] John Powell, a member of the disciplinary board, voted to terminate plaintiff for the infraction.
[8] Ed Ratliff is white.
[9] There is a conflict in the evidence whether the inmate climbed over the wall or squeezed through an opening in the wall.
[10] Inmates apparently become irritable when they are unable to obtain their work passes. Rather than discipline Ratliff for an apparent serious breach of security, John Powell lauded Ed Ratliff for "diffusing a volatile situation."
[11] Don Smith is black.
[12] Michael Doss is white.
[13] Tom Newland is white.
[14] Arthur Turney is white.
[15] The control center officer said that Sharon Hefele told him to open and close the front door.
[16] The disciplinary review board recommended that the letter of reprimand be removed from Doss' file after six months. Steve Long, however, decided to retain the letter of reprimand in Doss' file permanently.
[17] Less than two weeks earlier, plaintiff reported that correctional officer Arthur Turney cursed plaintiff with highly profane language when plaintiff gave him an unfavorable service rating. Powell concluded that Turney was merely venting justifiable frustration and refused to discipline him. Powell, however, was considerably more sensitive as the victim of insubordination.
[18] A person may sue under the equal protection clause for a claim of disparate treatment based on race. Disparate impact claims, however, are not cognizable under the fourteenth amendment. New York Transit Authority v. Beazer, 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979).