No. 95-3549

Melvin Hicks,                          *
                                       *
                Appellant,             *
                                       *
        v.                             *
                                       * Appeal from the United States
St. Mary's Honor Center;               * District Court for the
Department of Corrections and          * Eastern District of Missouri
Human Resources, Division of           *
Adult Institutions; Steve              *
Long,                                  *
                                       *
                Appellees.             *


_____

        Submitted:  April 11, 1996

            Filed:  July 22, 1996
_____

Before McMILLIAN, JOHN R. GIBSON and FAGG, Circuit Judges.
_____


McMILLIAN, Circuit Judge.


    Melvin Hicks appeals from a final judgment entered in the United
States District Court[1] for the Eastern District of Missouri in favor of his
former employer, St. Mary's Honor Center (St. Mary's), and the
superintendent of St. Mary's, Steve Long (together defendants), on his
claims arising under Title VII and the equal protection clause. Hicks v.
St. Mary's Honor Ctr., No. 88-109C(5) (E.D. Mo. Aug. 31, 1995) (Hicks V).
The judgment presently on appeal followed a remand from this court, id.,
2 F.3d 265, 267 (8th

_____

[1]The Honorable Stephen N. Limbaugh, United States District
Judge for the Eastern District of Missouri.

Cir. 1993) (Hicks IV) (amended by substitution on Feb. 15, 1994),[2] which, in turn, followed the Supreme Court's decision in St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993) (Hicks III), reversing our earlier decision, Hicks v. St. Mary's Honor Ctr., 970 F.2d 487 (8th Cir. 1992) (Hicks II), which had reversed the district court's original judgment in favor of defendants, id., 756 F. Supp. 1244 (E.D. Mo. 1991) (Hicks I). For reversal, plaintiff now argues that the district court clearly erred in finding that his demotion and discharge were not motivated by racial discrimination or a desire to retaliate against him for filing charges of employment discrimination with the Equal Employment Opportunity Commission (EEOC).[3] Applying the analytical principles set forth by the Supreme Court in Hicks III, we now affirm.

I.

The facts of this case are stated in detail in the district court's 1991 decision, Hicks I, 756 F. Supp. at 1246-49, 1250-52, and supplemented in Hicks V, slip op. at 7-9. Plaintiff, an African American male, was hired in August 1978 as a correctional officer at St. Mary's, a minimum security correctional facility

_____

[2]The unamended version of the panel's opinion is printed in the bound Volume 2 of the Federal Reporter, 3d Series. The final amended version of the panel opinion is available on Westlaw. Hicks v. St. Mary's Honor Ctr., 2 F.3d 265 (8th Cir. 1993) (amended by substitution on Feb. 15, 1994) (Hicks IV).

[3]The district court reaffirmed its findings of fact from its 1991 decision and declared those findings applicable to both the issue of whether defendants' personal animosity toward plaintiff was racially motivated and plaintiff's retaliation claim. Hicks v. St. Mary's Honor Ctr., slip op. at 7, No. 88-109C(5) (E.D. Mo. Aug. 31, 1995) (Hicks V). In its 1991 decision, the district court found that defendants' proffered reasons for demoting and discharging plaintiff were pretextual and that he was treated unfairly, but nevertheless found that defendants' "unfair treatment" of plaintiff was not motivated by race. Id., 756 F. Supp. 1244, 1252 (E.D. Mo. 1991) (Hicks I), rev'd and remanded, 970 F.2d 487 (8th Cir. 1992) (Hicks II), rev'd and remanded, 509 U.S. 502 (1993) (Hicks III).

-2-

(also referred to as a "halfway house") operated by the Missouri Department of Corrections and Human Resources. In February 1980, plaintiff was promoted to shift commander, a supervisory position. In January 1984, St. Mary's underwent extensive supervisory changes and, among them, Long became the superintendent of St. Mary's and John Powell became the chief of custody (and plaintiff's immediate supervisor). Hicks I, 756 F. Supp. at 1246. Prior to these personnel changes, plaintiff enjoyed a satisfactory employment record and had not been disciplined for any rule violations. Id. at 1249. Immediately afterward, however, he became the subject of repeated, and increasingly severe, disciplinary sanctions. Id. at 1246-48; Hicks III, 509 U.S. at 505.

Plaintiff was suspended for five days for rule violations committed on March 3, 1984, by his subordinates. Hicks I, 756 F. Supp. at 1246-47. Powell testified at trial that "it was his policy to discipline only the shift commander for violations which occurred on the commander's shift." Id. at 1250. However, the district court found that "plaintiff demonstrated such a policy only applied to violations which occurred on plaintiff's shift." Id. For example, some of the very same infractions for which plaintiff was suspended occurred under the watch of shift commander Sharon Hefele (who is white) and yet she was not disciplined. Id. at 1246 & n.3, 1250-51.

Later that month, a fight broke out between two inmates during plaintiff's shift. On March 29, 1984, plaintiff was given a letter of reprimand for allegedly failing to investigate the fight adequately. Id. at 1247. The district court found that, in comparison to this and other violations for which plaintiff was disciplined, "much more serious violations, when committed by plaintiff's co-workers, were either disregarded or treated much more leniently." Id. at 1251. For example, on one occasion, transportation officer Ed Ratliff (who is white) permitted an unescorted inmate access to Long's locked office. Id. at 1247 n.8,

1248, 1251. The district court described this rule violation as "a striking and obvious breach of security," noting that "the inmate had access to Long's private files" and "could have acquired a weapon to use against a correctional officer or another inmate." Id. at 1251. In response, however, "Powell not only refused to discipline Ratliff but praised him for 'diffusing a volatile situation.'" Id.

On March 19, 1984, two correctional officers under plaintiff's supervision used a St. Mary's vehicle without entering the vehicle use in a log book. Id. at 1247. Following that incident, Powell recommended that plaintiff be disciplined -- not for authorizing the use of the vehicle, but rather for failing to ensure that the use was logged. Id. A disciplinary review board comprised of two African Americans and two Caucasians voted on April 6, 1984, in support of plaintiff's demotion. Id. Powell was one of the four members of the disciplinary review board which voted on his recommendation that plaintiff be demoted; as a member of the disciplinary review board, Powell then voted to terminate rather than merely demote plaintiff. Id. at 1247 n.7.

On April 11, 1984, plaintiff filed a complaint with the EEOC. Hicks V, slip op. at 8. The complaint alleged racial discrimination in his employment conditions. Joint Appendix, Vol. I, at 9 (Plaintiff's First Amended Complaint, ¶ 10). At that point, plaintiff had received the five-day suspension and the letter of reprimand, but had not been notified of his demotion.

On April 19, 1984, plaintiff was notified in a meeting with Powell, Long, and the assistant superintendent, Vincent Banks, that he was being demoted from shift commander to correctional officer. Hicks I, 756 F. Supp. at 1247. Upon review of plaintiff's demotion, the district court found that this was an example of how plaintiff was treated much more harshly than co-workers whose rule violations were equally severe or more severe. Id. at 1251. For

example, acting shift commander Michael Doss (who is white) allowed an inmate to escape during his shift. Id. at 1251, 1248 & n.12. Doss admitted that his negligence permitted the escape. Id. at 1251. The district court noted "[a]lthough the escape of an inmate is clearly much more serious than the failure to log the authorized use of a vehicle, Doss was only given a letter of reprimand for the violation." Id.

On May 7, 1984, plaintiff filed another complaint with the EEOC. Hicks V, slip op. at 8. He alleged in his second EEOC complaint that he had been demoted due to racial discrimination and in retaliation for having filed the first EEOC complaint. Joint Appendix, Vol. I, at 9-10 (Plaintiff's First Amended Complaint, ¶ 15).

On June 7, 1984, plaintiff was discharged ostensibly for threatening Powell during an argument, which occurred after plaintiff was informed of his demotion. According to the district court's findings, plaintiff requested the day off upon being told of the demotion. Long granted the request and, as plaintiff attempted to leave, Powell followed him and ordered him to open his locker so that Powell could retrieve plaintiff's shift commander's manual. Plaintiff refused to comply, and the two exchanged heated words. Plaintiff indicated that he would "step outside" with Powell, to which Powell warned that his words could be perceived as a threat. Plaintiff then left. Hicks I, 756 F. Supp. at 1247. Powell claimed that plaintiff had threatened him and sought disciplinary action against plaintiff. On May 9, 1984, a four-member disciplinary board, including at least two African Americans, voted to suspend plaintiff for three days. Id. However, contrary to the disciplinary review board's decision, Long recommended to his superiors that plaintiff be terminated. Id. at 1247-48. At trial, Long testified that his recommendation was based upon "the severity and accumulation of plaintiff's violations." Id. at 1248. With respect to plaintiff's alleged

threats to Powell, the district court found "the evidence suggests that Powell manufactured the confrontation between plaintiff and himself in order to terminate plaintiff." Id. at 1251. As to the severity and accumulation of plaintiff's violations, upon which Long allegedly relied in recommending plaintiff's termination, the district court concluded that those reasons were pretextual. Id.

Plaintiff brought this employment discrimination action in federal district court, asserting Title VII claims against St. Mary's and a § 1983 equal protection claim against Long. The district court held a bench trial at which plaintiff presented a disparate treatment case. Addressing plaintiff's racial discrimination claim only, the district court found for defendants. In considering the evidence according to the analytical framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the district court held that "[p]laintiff proved a prima facie case of race discrimination" and that "defendant has succeeded in setting forth a legitimate, non-discriminatory reason for the adverse employment action." Hicks I, 756 F. Supp. at 1250. At that time, defendants had proffered "two legitimate, non-discriminatory reasons for their actions: the severity and the accumulation of rules violations committed by [plaintiff]." Hicks III, 509 U.S. at 507 (citing Hicks I, 576 F. Supp. at 1250). Upon consideration of the evidence at trial, the district court found that defendants' proffered reasons were not the real reasons for their adverse treatment of plaintiff because plaintiff was the only supervisor disciplined for rule violations committed by subordinates; similar and even more serious violations committed by plaintiff's co-workers were disregarded or treated more leniently; and Powell had manufactured the final argument with plaintiff in order to provoke plaintiff into threatening him. Id. at 508 (citing Hicks I, 576 F. Supp. at 1250-51). Thus, the district court concluded "[p]laintiff has carried his burden in proving that the reasons given for his demotion and termination were

pretextual." Hicks I, 576 F. Supp. at 1251. Nevertheless, the district court held that plaintiff had failed to prove that his race motivated defendants' decisions to demote and to discharge him. The district court relied on evidence that: each of the two four-member disciplinary review boards which recommended disciplining plaintiff included two African Americans[4]; plaintiff's African American subordinates (i.e., non-supervisors), who actually committed the rule violations, were not disciplined; and the total number of African American employees at St. Mary's remained relatively constant despite the numerous personnel changes that occurred.[5] Hicks III, 509 U.S. at 508 n.2 (citing Hicks I, 756 F. Supp. at 1244, 1252). The district court stated "although plaintiff has proven the existence of a crusade to terminate him, he has not proven that the crusade was racially rather than personally motivated." Hicks I, 756 F. Supp. at 1252. Thus, the district court entered judgment for defendants. Id. at 1253. The district court did not address plaintiff's additional claim that defendants had demoted and terminated him in retaliation for filing two charges of unlawful employment practices with the EEOC.

On appeal to this court, we reversed because the district court's analysis was inconsistent with cases previously decided in

---

[4]According to the district court's findings, the first disciplinary review board, which approved Powell's recommendation to demote plaintiff, included Powell himself as a member and, as a member of the review board, Powell voted for plaintiff's termination. Hicks I, 756 F. Supp. at 1247 & n.7. The second disciplinary review board, which voted to have plaintiff suspended for three days, was disregarded by Long who instead recommended plaintiff's discharge. Id. at 1247-48.

[5]In the period from December 1983 to December 1984, approximately twelve African American employees were terminated. Only one Caucasian employee was terminated. Long hired approximately the same number of African Americans as were fired. Id. at 1249. Consequently, the total number of African American employees remained relatively constant, although the number of African American supervisors declined. See infra note 8 and accompanying text.

-7-

our circuit. <u>Hicks II</u>, 970 F.2d at 493 (citing cases). We held that once plaintiff had proven all of defendants' proffered reasons for the demotion and discharge to be pretextual, plaintiff was entitled to judgment as a matter of law. <u>Id.</u> at 492. Having reversed the district court's judgment on the merits of plaintiff's racial discrimination claim, we declined to reach plaintiff's separate argument that the district court had erred in failing to address his retaliation claim. <u>Id.</u> at 493 n.9.

Defendants petitioned the Supreme Court for a writ of certiorari. The Supreme Court granted defendants' petition to address the legal issue presented by this case, upon which the circuits were fairly evenly divided. <u>See</u> <u>Hicks III</u>, 509 U.S. at 512-13 (citing cases). The Supreme Court, in a 5-4 decision, reversed our decision. Justice Scalia, writing for the majority, held:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of discrimination,[] and the Court of Appeals was correct when it noted that, upon such rejection, "[n]o additional proof of discrimination is *required*," 970 F.2d at 493 (emphasis added). But the Court of Appeals' holding that rejection of the defendant's proffered reasons *compels* judgment for the plaintiff disregards the fundamental principle of Rule 301 that a presumption does not shift the burden of proof, and ignores our repeated admonition that the Title VII plaintiff at all times bears the "ultimate burden of persuasion."

<u>Id.</u> at 511 (footnote and citations omitted).

On remand from the Supreme Court, this court remanded the case to the district court in order to provide the parties and the district court a full and fair opportunity to apply the Supreme

Court's clarification. Hicks IV, 2 F.3d at 267. Initially, the Hicks IV opinion stated the following.

> In particular, the district court may decide to hold an evidentiary hearing in order to permit the parties to present additional evidence on the now-critical question of personal animosity. For example, Hicks may be able to demonstrate that defendants were not motivated by personal animosity or that defendants' personal animosity was itself racially motivated.

Id. (as published in bound volume). Six months later, however, this court entered an order denying a petition for rehearing by the panel and substituting the following language for the language quoted above.

> The issue of retaliatory discharge as a basis for Title VII liability was not reached in the district court's first opinion. [Hicks II, 970 F.2d at 493 n.9]. The district court may decide to hold an evidentiary hearing in order to permit the parties to present additional evidence.

Hicks v. St. Mary's Honor Ctr., No. 91-1571 (8th Cir. Feb. 15, 1994) (order denying petition for rehearing by the panel and substituting a new page 4 for page 4 of the opinion as originally filed). Thereafter, a suggestion for rehearing en banc was denied.

On remand, the district court correctly opined that the language that accompanied the February 15, 1994, order superseded the language in the original Hicks IV opinion. Nevertheless, noting the confusion created by the page substitution, the district court decided to address both (1) the issue of whether defendants' personal animosity toward plaintiff was motivated by race and (2) plaintiff's retaliation claim. See Hicks V, slip op. at 3.

The parties agreed, with the district court's approval, that, rather than hold a rehearing, plaintiff would be permitted to take

new depositions of Powell and Long. Id. at 4. The transcripts of Powell's and Long's depositions, along with other forms of documentary evidence, were then submitted to the district court for its consideration. Id. Upon review of the evidence related to the personal animosity issue, the district court concluded "[e]xtensive findings of fact were initially made by this Court and there is no new reason to change those findings. The Court determines that those findings are applicable . . . to the alleged racially motivated personal animosity directed at plaintiff by defendants." Id. at 7. In other words, the district court reaffirmed its earlier finding that defendants' unfair treatment of plaintiff was motivated by personal animosity; the district court, as factfinder, further concluded that this personal animosity was not motivated by race. The district court stated "[t]here is no suspicion of mendacity here, and the ultimate fact of intentional discrimination, therefore, should not be inferred." Id. at 9.

On plaintiff's separate retaliation claim, the district court noted that its initial findings were applicable to that claim as well, id. at 7, and concluded that plaintiff's discharge was not motivated by a desire to retaliate against plaintiff for filing a complaint with the EEOC. Id. at 8. In an effort to be more specific, the district court explained:

> Plaintiff filed his initial complaint with the Equal Employment Opportunity Commission on April 11, 1984 and a second complaint was filed May 7, 1984. The decision to discharge plaintiff was made May 21, 1984, four days after the Department of Corrections received notice of the second complaint on May 17, 1984. The decision-maker was the Director of the Division of Adult Institutions, Donald Wyrick. There is no evidence to indicate that Wyrick was aware of the filing of the second complaint. In any event, the Court as the trier of fact determines that there was a lack of racial motivation in the decision to demote and discharge the plaintiff as retaliation for his filing of complaints with the Equal Employment Opportunity Commission. The same reasons are applicable as were stated in this Court's initial decision and finding.

<u>Id.</u> at 8-9.

The district court entered judgment for defendants on the merits of plaintiffs' claims, <u>id.</u> at 9, and this appeal followed.

II.

Plaintiff argues in the present appeal that the district court clearly erred in finding that defendants treated him unfairly because of personal animosity *unrelated to his race*. Plaintiff argues that the overwhelming evidence of disparate treatment between himself, an African American, and similarly situated Caucasians who also held supervisory positions at St. Mary's, leads inescapably to the conclusion that race was an underlying motivation in defendants' "crusade to terminate him." <u>Hicks I</u>, 756 F. Supp. at 1252. Moreover, he emphasizes, the only reasons given by defendants at trial for demoting and discharging him were the severity and accumulation of his alleged rule violations -- reasons which were conclusively proven to be pretextual. <u>Id.</u> at 1251. Finally, plaintiff notes that, when Long and Powell were deposed following the remand from this court, *each testified that he did not feel any personal animosity toward plaintiff*.[6] In fact,

_____

[6]Long testified in his deposition as follows.

> Q. Did you have any personal animosity towards Mr. Hicks?
> A. No, sir.
> Q. Was there any reason other than his alleged violation of rules that caused you to make a recommendation for his termination?
> A. No, sir.

Joint Appendix, Vol. II at 121-22 (deposition Steve Long).

Powell testified in his deposition as follows.

> Q. Okay. Just directing your attention to then Mr. Hicks, did you have any personal problems with him of any nature?
> A. Personal, no.

-11-

notwithstanding the district court's finding of pretext, Long continued to maintain that the only reason why he recommended plaintiff's termination was that plaintiff had committed rule violations.

In response, defendants' counsel now abandons the rule violations explanation (even though Long himself does not) and astutely embraces "personal animosity" as the justification for defendants' actions. Brief for Appellees at 13, 17-19. Defendants now argue that Powell's personal animosity toward plaintiff is "the lawful reason for [plaintiff's] discharge." Id. at 19. In addition, even though Powell's own personal animosity now purportedly constitutes the real reason for plaintiff's demotion and discharge, defendants continue to rely on statistical evidence concerning, for example, the constancy in the overall number of African Americans employed at St. Mary's (i.e., the total number of supervisors and non-supervisors) and the fact that the four-member disciplinary review boards which recommended disciplining plaintiff

---

. . . .

Q.   Okay.  Now, what I'm trying to find out, Mr. Powell, the court has made certain findings that you and Mr. Long put him on an express track for dismissal.  And I'm trying to find out if there was any reason other than your feeling that he had violated some rules for your actions.

A.   No, sir.  I just reported the activities.

Q.   You just reported on his activities?

A.   Yes, sir.

Q.   So you had no personal animosity?

A.   No, sir.  None whatsoever.

Joint Appendix, Vol. II at 146, 147 (deposition of John Powell).

-12-

included at least two African Americans.  Id. at 14, 19-20.[7]  Defendants also highlight the fact that the number of African Americans and Caucasians in supervisory positions would have been equal (3 and 3) but for the decision by an African American male to turn down the chief of custody position (which was later offered to Powell).[8]  Id.

Upon review for clear error of the district court's finding that racial discrimination did not motivate plaintiff's demotion and discharge, we affirm in light of the Supreme Court's mandate in Hicks III.  509 U.S. at 514-15 ("We have no authority to impose liability upon an employer for alleged discriminatory employment practices unless an appropriate factfinder determines, according to proper procedures, *that the employer has unlawfully discrimi-nated*. . . .  [N]othing in law would permit us to substitute for the required finding that the employer's action was the product of unlawful discrimination, the much different (and much lesser) finding that the employer's explanation of its action was not believable.").

III.

Plaintiff separately argues that the district court clearly erred in concluding that "the decision to discharge plaintiff was not motivated by a desire to retaliate against plaintiff for instituting a complaint with the Equal Employment Opportunity Commission."  Hicks V, slip op. at 8 (citing Greenwood v. Ross, 778 F.2d 448, 456 (8th Cir. 1985) (reversing district court's dismissal

---

[7]But see supra notes 4, 5 and infra note 8.

[8]Consequently, the ratio of African American to Caucasian supervisors changed from 5:1 in 1983 to 2:4 after January 1984 (but could have been 3:3 in 1984).  Brief for Appellees at 12, 14, 20, 29; Joint Appendix, Vol. I, at 70.  Of the two African Americans retained after January 1984, one was plaintiff.  Joint Appendix, Vol. I, at 70.

of plaintiff's Title VII retaliatory discharge claim and holding that plaintiff established a prima facie case by showing that defendants, knowing that plaintiff had engaged in protected activity, refused to renew his employment contract)).  In response, defendants argue that the lawful nondiscriminatory reason defendants now rely upon to rebut plaintiff's racial discrimination claim (i.e., Powell's personal animosity) equally applies to plaintiff's retaliation claim and, together with evidence that is "inconsistent" with racial discrimination, "compels" a finding for defendants on plaintiff's retaliation claim.  Brief for Appellees at 24-25.

We begin by noting that, in discussing plaintiff's retaliation claim, the district court stated the following.

> Plaintiff filed his initial complaint with the Equal Employment Opportunity Commission on April 11, 1984 and a second complaint was filed May 7, 1984.  The decision to discharge plaintiff was made May 21, 1984, four days after the Department of Corrections received notice of the second complaint on May 17, 1984.  The decision-maker was the Director of the Division of Adult Institutions, Donald Wyrick.  There is no evidence to indicate that Wyrick was aware of the filing of the second complaint.  In any event, the Court as the trier of fact determines that there was a lack of racial motivation in the decision to demote and discharge the plaintiff as retaliation for his filing of complaints with the Equal Employment Opportunity Commission.  The same reasons are applicable as were stated in this Court's initial decision and finding.

Slip op. at 9 (emphasis added).  The sentence underlined above clearly suggests that defendants made a "decision to demote and discharge the plaintiff *as retaliation* for his filing of complaints with the [EEOC]," but that these adverse actions were not unlawful because they were not *racially* motivated.  The sentence therefore indicates that the district court assumed plaintiff was required to prove racial motivation in order to prevail on his retaliation claim.  Racial motivation was not an element of plaintiff's burden

of proof.[9] <u>See</u> 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his [or her] employees . . . because he [or she] has made a charge . . . under this subchapter."); <u>Womack v. Munson</u>, 619 F.2d 1292, 1296 (8th Cir. 1980) (<u>Womack</u>) (setting forth legal standards applicable to Title VII retaliatory discharge claim), <u>cert. denied</u>, 450 U.S. 979 (1981); <u>cf.</u> <u>Wentz v. Maryland Casualty Co.</u>, 869 F.2d 1153, 1154-55 (8th Cir. 1989) (<u>Wentz</u>) (analogizing Title VII and ADEA retaliation claims and citing <u>Womack</u> as providing applicable analytical framework) (reversing summary judgment granted to defendant on plaintiff's ADEA retaliatory discharge claim where district court relied on the failure of plaintiff's age discrimination claim to decide plaintiff's retaliation claim).

In <u>Wentz</u>, the district court had stated the following reasons for holding, on summary judgment, that the plaintiff had failed as a matter of law to establish his prima facie case of unlawful retaliation under the ADEA.

> The [c]ourt finds that Wentz did not engage in protected opposition to age discrimination in light of its ruling above that Maryland did not discriminate against Wentz on the basis of age. While Wentz'[] complaint may have been a legitimate reaction to allegedly rude conduct by [a supervisor], it could not constitute justifiable opposition to age discrimination, as Wentz was criticized and ultimately terminated because of his poor work performance, and not because of his age.

869 F.2d at 1154 (quoting the district court's opinion below, No. 4-87-195, slip op. at 8 (D. Minn. Dec. 3, 1987)). On appeal,

---

[9]Likewise, contrary to defendants' argument on appeal, the statistical evidence relied upon by defendants as inconsistent with a finding of racial discrimination is not relevant to plaintiff's retaliation claim. Brief for Appellees at 25 ("Other evidence is inconsistent with intentional, racial discrimination. That evidence of a lawful, nonracial motive for his demotion and discharge equally proves the absence of a retaliatory motive.").

this court reversed and remanded the case to the district court, explaining that, in order to establish statutorily protected activity, a plaintiff need not show that the conduct he or she opposed was in fact discriminatory. Id. at 1155. Instead, the plaintiff "must demonstrate a good faith, reasonable belief that the underlying challenged action violated the law." Id. In the present case, there can be little doubt that plaintiff demonstrated a good faith reasonable belief that defendants' actions violated the law in light of the district court's extensive findings which illustrated that "[a]lthough plaintiff committed several violations of institutional rules, plaintiff was treated much more harshly than his co-workers who committed equally severe or more severe violations." Hicks I, 756 F. Supp. at 1251. However, by contrast to the plaintiff in Wentz, plaintiff in the present case has failed to raise on appeal the district court's apparent error, and we hold that it does not rise to the level of plain error.

As to whether the district court clearly erred in deciding that defendants were not motivated by a desire to retaliate against plaintiff for engaging in protected activity, which plaintiff did raise on appeal, we consider the district court's additional findings regarding some of the significant dates in the present case. The district court specifically noted the dates on which plaintiff filed with the EEOC (April 11, 1984, and May 7, 1984), the date on which the Department of Corrections received notice of the second complaint (May 17, 1984), and the date the decision was made to discharge plaintiff (May 21, 1984). Hicks V, slip op. at 8. The district court further found "[t]he decision-maker was the Director of the Division of Adult Institutions, Donald Wyrick. There is no evidence to indicate that Wyrick was aware of the filing of the second complaint." Id.

The finding that Donald Wyrick was unaware of plaintiff's *second* EEOC filing reveals nothing with respect to the relationship

-16-

between plaintiff's discharge and his *first* EEOC filing.[10] Moreover, Wyrick was not solely responsible for plaintiff's discharge as it was Powell who initiated the disciplinary proceedings, and it was Long who recommended plaintiff's termination notwithstanding the disciplinary review board's endorsement of a three-day suspension. Hicks I, 756 F. Supp. at 1247-48 (describing the roles of Powell and Long in the context of plaintiff's claim that his discharge was racially motivated, but nowhere mentioning Donald Wyrick's role). Finally, to the extent that "personal animosity" led to plaintiff's termination, clearly it was not solely Wyrick's personal feelings that made it so. See id. at 1251 ("It is clear that Powell had placed plaintiff on the express track to termination. It is also clear that Powell received the aid of Ed Ratliff and Steve Long in this endeavor.").

---

[10]With respect to plaintiff's first EEOC filing and his demotion, plaintiff failed even to establish a prima facie case. The April 6, 1984, vote by a disciplinary review board in favor of his demotion occurred five days before plaintiff filed his first EEOC complaint. Powell, therefore, had to have recommended the demotion at least five days before plaintiff's first filing. By contrast, however, Long's decision to recommend plaintiff's discharge (despite the disciplinary review board's vote on May 9, 1984, in favor of a three-day suspension) as well as Donald Wyrick's formal decision to accept Long's recommendation, occurred approximately one month after the date on which plaintiff filed his first EEOC complaint (April 11, 1984), and at least nine days after the date on which, according to defendants, they received actual notice of plaintiff's first EEOC complaint (April 30, 1984). See Brief for Appellees at 24 n.5, & Addendum, at 7 (memorandum from Long to Leigh Wayne, Human Relations Officer, stating that notice was received on April 30). Therefore, the timing of events supports the inference that plaintiff's first EEOC filing was causally related to his discharge. See Greenwood v. Ross, 778 F.2d 448, 456 (8th Cir. 1985) (holding that the facts were sufficient to establish a prima facie case of retaliatory discharge where (1) the plaintiff had filed an EEOC complaint and a federal lawsuit, (2) the defendants knew about his protected activity and considered it detrimental, and (3) his immediate supervisor, with the knowledge and consent of his superiors, refused to renew the plaintiff's employment contract).

Nevertheless, the district court did state in its opinion the ultimate factual conclusion that defendants' decision to discharge plaintiff "was not motivated by a desire to retaliate against plaintiff for instituting a complaint with the [EEOC]." Hicks V, slip op. at 8. Therefore, we affirm in light of the Supreme Court's mandate in Hicks III.

IV.

For the foregoing reasons, the judgment of the district court is affirmed.

A true copy.

    Attest:

        CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-18-